IN THE SUPREME COURT OF NORTH CAROLINA

No. 90PA18

Filed 10 May 2019

STATE OF NORTH CAROLINA

v.

WILLOUGHBY HENEREY MUMMA

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) of a divided decision of the Court of Appeals, ___ N.C. App. ___, 811 S.E.2d 215 (2018), finding no prejudicial error upon appeal from a judgment entered on 10 June 2016 by Judge Marvin P. Pope, Jr. in Superior Court, Swain County. Heard in the Supreme Court on 4 March 2019.

*Joshua H. Stein, Attorney General, by Sherri Horner Lawrence, Assistant Attorney General, for the State.*

*Meghan Adelle Jones for defendant-appellant.*

ERVIN, Justice.

The issues before us in this case concern whether the Court of Appeals erred by determining that the trial court did not commit prejudicial error by allowing the jury, without the consent of the parties, to review certain photographs that had been admitted into evidence in the jury room and did not commit plain error by instructing the jury concerning the effect of a determination that defendant Willoughby Henerey Mumma was the "aggressor" upon defendant's right to act in self-defense. After

carefully considering the record in light of the applicable law, we hold that defendant was not prejudiced by the trial court's decision to allow the jury to review the photographs in the jury room without his consent and that the trial court's decision to include an "aggressor" instruction in its discussion of the law of self-defense did not constitute plain error. As a result, we modify and affirm the decision of the Court of Appeals.

## I. Factual Background

## A. Substantive Facts

On 9 November 2011, defendant lived with his wife, Amy Chapman, and her fifteen-year-old son, Christopher Robinson. At approximately 5:30 p.m. on that date, when Mr. Robinson came home after visiting his girlfriend following school, he discovered that defendant and his mother were consuming Clonopin and drinking alcohol. Between 8:00 and 8:30 p.m., Ms. Chapman got a ride to the store, where she purchased more alcohol.

From 8:11 until 8:21 p.m., defendant had a text message exchange with his friend, Dewayne Bradley, during which defendant stated that:

> Defendant:  Im goin 2 kil her.
>
> Mr. Bradley:  Please dont.
>
> Defendant: Im goin 2 I cant take.
>
> Mr. Bradley:  Man just walk down the road.
>
> Defendant: Do u have ne lime?

Mr. Bradley:  Noooooo just chill.

Defendant:  No Im over it I cant take no more I luv u bro.

Mr. Bradley:  Please lessen to me.

Defendant:  Im sorry I have 2.

Mr. Bradley:  Man, Ill come and get 2morr my word.

Defendant:  Line wil get rid of the body.

Subsequently, Ms. Chapman purchased additional pills from an acquaintance who came to the residence in which she, defendant, and Mr. Robinson resided.

At approximately 9:45 p.m., Mr. Robinson awoke; heard an argument between defendant and Ms. Chapman; entered their bedroom, in which the couple was sitting adjacent to each other on the bed; urged them to stop arguing; and then went back to bed himself.  Defendant claimed that, later on the same evening, Ms. Chapman, who had taken a shower while he was still sitting on the bed, emerged from the bathroom with a knife and attacked him with it.  After gaining control of the knife, defendant stabbed Ms. Chapman to death.

The next morning, defendant sent several text messages to Mr. Bradley in which he requested Mr. Bradley to drive Mr. Robinson to school.  After Mr. Bradley and his wife, who was driving the couple's vehicle, arrived, Mr. Bradley entered the house. At that time, defendant showed Mr. Bradley the body of Ms. Chapman, which was lying on the floor of a closet in the bedroom that the two of them had shared.

Upon seeing Ms. Chapman's body, Mr. Bradley quickly left the residence, reentered his vehicle, and told his wife and Mr. Robinson to lock the doors to prevent defendant from accessing the vehicle. After his wife had driven away from the residence, Mr. Bradley informed Mr. Robinson that his mother was dead and called for emergency assistance. Defendant, who had entered the woods behind the residence, was taken into custody at approximately 5:18 p.m.

### B. Procedural History

### 1. Trial Court Proceedings

On 22 November 2011, the Swain County grand jury returned a bill of indictment charging defendant with first-degree murder. The charge against defendant came on for trial before Judge Marvin P. Pope, Jr., and a jury at the 23 May 2016 criminal session of the Superior Court, Swain County. At least one hundred and seventy-nine photographs were admitted into evidence during the trial, all but one of them without any objection from defendant. At the conclusion of the trial, the trial court, without any objection from defendant, instructed the jury concerning the issue of self-defense. On a number of occasions during its self-defense instruction, the trial court stated that defendant would not be excused of murder or manslaughter on self-defense grounds if he "was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased."

While the jury deliberated, it sent a note to the trial court in which it requested "Evidence – ALL PHOTOS PLEASE." After noting that "it's in the Court's

discretion," defendant's trial counsel objected to allowing the jury to review the photographs in the jury room and stated his preference "for [the jurors] to rely on the testimony and recollection." The trial court responded that, "In my discretion, I'm going to allow them to have all the photographs that have been introduced into evidence" and then had the photographs delivered to the jury room.

After it had deliberated for approximately two hours, the jury sent the trial court a note indicating that it was divided eleven to one and was unable to reach a verdict. In response to the jury's note, and at defendant's request, the trial court instructed the jury in accordance with the United States Supreme Court's decision in *Allen v. United States*, 164 U.S. 492, 501-02, 17 S. Ct. 154, 157, 41 L. Ed. 528, 530-31 (1896). Following further deliberations, the jury returned a verdict convicting defendant of second-degree murder. Based upon the jury's verdict, the trial court entered a judgment sentencing defendant to a term of 180 to 225 months imprisonment. Defendant noted an appeal to the Court of Appeals from the trial court's judgment.

## 2. Appellate Proceedings

In seeking relief from the trial court's judgment before the Court of Appeals, defendant contended that the trial court had "violated a statutory mandate or committed plain error by giving erroneous jury instructions on self-defense" and "erred by sending inflammatory photographs of the decedent's body to the jury deliberation room." *State v. Mumma*, ___ N.C. App. ___, ___, 811 S.E.2d 215, 218

(2018). In determining that "the trial court did not err in instructing the jury on the aggressor doctrine where sufficient evidence supported the instruction," *id.* at ___, 811 S.E.2d at 220, the Court of Appeals noted that the "DVD recording of defendant's 10 November 2011 interview with law enforcement officers [that] was played for the jury in which he described how [Ms. Chapman] came at him with the knife, he took the knife away from her, and proceeded to get on top of her and stab her in the neck and then in the eye" showed that "defendant became the aggressor after he gained control of the knife and then proceeded to get on top of [Ms. Chapman] and stab her," *id.* at ___, 811 S.E.2d at 219. Despite defendant's testimony that Ms. Chapman "kept trying to regain control of the knife," the Court of Appeals noted that "defendant not only maintained control of the knife throughout the remainder of the fight, but he also continued the fight until [Ms. Chapman] was killed." *Id.* at ___, 811 S.E.2d at 219. In view of the fact that defendant "had no visible injuries aside from a few scratches" while Ms. Chapman sustained multiple serious wounds and the fact that "defendant sent multiple text messages stating he was going to kill" Ms. Chapman, the Court of Appeals concluded that there was "sufficient evidence from which a jury could find that defendant was the aggressor." *Id.* at ___, 811 S.E.2d at 220.

In addition, the Court of Appeals held, in reliance upon this Court's decision in *State v. Cunningham*, 344 N.C. 341, 364, 474 S.E.2d 772, 783 (1996) (stating that, "[a]lthough the defendant did not object to the sending of the exhibits to the jury room, he did not consent to it as required by the statute"; however, "[i]n light of the

strong evidence against the defendant, letting the jury have these items of evidence in the jury room could not have affected the outcome"), that, even if sending the photographic exhibits to the jury room constituted error, any such error "was harmless where defendant has failed to establish that he was prejudiced in light of the overwhelming evidence of [his] guilt." *Mumma*, ___ N.C. App. at ___, 811 S.E.2d at 221. In reaching this conclusion, the Court of Appeals determined that "the photographs of the injuries . . . were . . . relevant to show the type, severity, and number of injuries sustained by the deceased," "the extent and nature of her injuries," and "the location and position — inside a closet — in which she was found by law enforcement" officers, with these photographs constituting "the best evidence to help illustrate the responding officers' testimony." *Id.* at ___, 811 S.E.2d at 221. After noting that defendant had failed to object to the admission of the photographs that the jury viewed in the jury room into evidence, the Court of Appeals held that defendant "has not established how he was prejudiced by the trial court's decision to allow the jurors to review photographic exhibits which they had already seen" given that the record contained "more than sufficient evidence for a jury to find beyond a reasonable doubt that defendant committed second-degree murder and did not act in self-defense," including the expert testimony of the pathologist who testified for the

State, defendant's own testimony, and the text messages that defendant had sent to Mr. Bradley. *Id.* at \_\_\_, 811 S.E.2d at 221.[1]

Judge Arrowood filed a dissenting opinion in which he stated that he would have held that "defendant has met his burden of establishing there is a reasonable possibility that," had the photographs of Ms. Chapman's body not been sent to the jury room without defendant's consent, a different result would have been reached at trial. *Id.* at \_\_\_, 811 S.E.2d at 223-24 (Arrowood, J., dissenting). In support of this determination, Judge Arrowood

> consider[ed] the circumstances of this case in their entirety, including: the large number of photographs (179), the fact that many of the photographs were graphic, the fact that only the photographic evidence was taken to the jury room, the fact that the improper photographs were in the jury room for almost the entire deliberation, and, particularly noteworthy, the facts that the jury was deadlocked . . . and that the court provided instructions and verdict sheets to the jury with various options to find defendant guilty[.]

*Id.* at \_\_\_, 811 S.E.2d at 223-24. As a result, Judge Arrowood would have awarded defendant a new trial.

After defendant's appellate counsel was unable to obtain written authorization from defendant to file a timely notice of appeal from the Court of Appeals' decision based upon Judge Arrowood's dissent or a timely petition seeking discretionary

---

[1] The Court of Appeals also held that the trial court did not err by failing to intervene *ex mero motu* during the State's closing argument; however, this issue has not been brought forward for our consideration. *Mumma*, \_\_\_ N.C. App. at \_\_\_, 811 S.E.2d at 223.

review of the Court of Appeals' decision, defendant filed a petition seeking the issuance of a writ of certiorari by this Court authorizing review of the Court of Appeals' opinion on 26 May 2018. In seeking further review before this Court, defendant contended that the record provided ample justification for a finding that the trial court's decision to allow the photographs that had been admitted into evidence to be reviewed in the jury room over defendant's objection constituted prejudicial error and that the Court of Appeals' decision to the contrary would have ordinarily been reviewable on the basis of Judge Arrowood's dissent and, in addition, argued that the Court of Appeals' decision to affirm the trial court's instructions to the jury with respect to the "aggressor" issue conflicted with prior decisions of this Court and involved significant legal principles. The State, on the other hand, argued that the Court should deny defendant's certiorari petition on the grounds that defendant had failed to adequately document his explanation for failing to note an appeal from or seek discretionary review of the Court of Appeals' decision in a timely manner, that the Court of Appeals had correctly held that the trial court's decision to allow the jury to review the photographs that had been admitted into evidence at trial in the jury room during its deliberations did not prejudice defendant's chances for a more favorable outcome at trial, and that the trial court did not err, much less commit plain error, in instructing the jury concerning the "aggressor" doctrine. The Court allowed defendant's certiorari petition on 7 June 2018.

## II. Legal Analysis

### A. Allowing Review of the Exhibits in the Jury Room

In seeking to persuade us to reverse the Court of Appeals' decision, defendant begins by contending that the Court of Appeals erred in determining that the trial court's decision to allow the members of the jury to review the photographs that had been admitted at trial in the jury room during its deliberations over defendant's objection did not constitute prejudicial error. Arguing in reliance upon *State v. Poe*, 119 N.C. App. 266, 274-75, 458 S.E.2d 242, 247-48, *disc. rev. denied*, 341 N.C. 423, 461 S.E.2d 765 (1995), in which the Court of Appeals determined that the jury's review of a witness statement in the jury room without the consent of all parties constituted prejudicial error, defendant contends that the photographs at issue in this case "may well have caused the jury to give greater weight to the State's version of" whether defendant acted in self-defense given that a side-by-side comparison of the photographs of the injuries sustained by defendant and Ms. Chapman would have tended to persuade the jury that defendant did not deserve to be acquitted on the grounds of self-defense. Defendant juxtaposes N.C.G.S. § 15A-1233(b), which permits juries, "with consent of all parties," to "take to the jury room exhibits and writings which have been received in evidence," with N.C.G.S. § 15A-1233(a), which allows the jury to review items that have been admitted into evidence in the courtroom regardless of whether the parties agree to such a review, and contends that these statutory provisions make it clear that the "inspection of evidence in the jury room is

categorically different from inspection in the courtroom." In addition, defendant contends that our decision concerning whether the inspection of evidence in the jury room in the absence of consent from both parties constitutes prejudicial error should be informed by N.C.G.S. § 8C-1, Rule 403, which prohibits the admission of evidence when the probative value of that evidence is outweighed by the danger of unfair prejudice, with the application of that standard tending to indicate that the presence of the photographs that had been admitted into evidence, forty-one of which depict Ms. Chapman's corpse, for nearly three hours in the jury room "likely inflamed the jury's emotions" and led it to decide the case on an improper basis.

The State, on the other hand, asserts that any error that the trial court may have committed in allowing the jury to review the photographs that were admitted into evidence in the jury room without defendant's consent was harmless, with this contention resting, in part, upon the text messages that defendant sent to Mr. Bradley before Ms. Chapman's death, defendant's admission that he was able to obtain and keep control of the knife with which he stabbed Ms. Chapman, and the "very minor injuries" that defendant sustained in comparison to the multiple, severe injuries that defendant inflicted upon Ms. Chapman. The State notes, among other things, that defendant objected to only one of the photographs that was admitted into evidence and that the trial court allowed the jury to review in the jury room and that the photographs that the jury reviewed in the jury room in accordance with the trial court's decision were "relevant, illustrative, and non-inflammatory." Finally, the

State points out that *Poe*, 119 N.C. App. 266, 458 S.E.2d 242, is not binding upon this Court and can, in any event, be distinguished from this case on the grounds that the photographs in this case, unlike the obviously incriminating witness statement at issue in *Poe,* did not "suggest a verdict" and instead "depicted what was shown in them and [were] not subject to any additional interpretation or inferences."

N.C.G.S. § 15A-1233(b) provides, in pertinent part, that, "[u]pon request by the jury and with consent of all parties, the judge may in his discretion permit the jury to take to the jury room exhibits and writings which have been received in evidence." N.C.G.S. § 15A-1233(b) (2017). This Court has held that permitting juries to take evidence to the jury room without the consent of the parties constitutes error. *Cunningham*, 344 N.C. at 364, 474 S.E.2d at 783 (assuming that the trial court erred by sending certain exhibits into the jury room for the jury's review when the defendant, who did not object, "did not consent to it as required by the statute"); *State v. Cannon*, 341 N.C. 79, 83, 459 S.E.2d 238, 241 (1995) (holding that the trial court erred by allowing the jury to review evidence in the jury room without the consent of all parties); *State v. Huffstetler*, 312 N.C. 92, 114, 322 S.E.2d 110, 124 (1984) (noting that this Court in *State v. Barnett*, 307 N.C. 608, 621, 300 S.E.2d 340, 347 (1983), in dicta, "interpreted [N.C.G.S. § 15A-1233(b)] to mean that the consent of all parties is required before the jury may take evidence to the jury room"), *cert. denied*, 471 U.S. 1009, 105 S. Ct. 1877, 85 L. Ed. 2d 169 (1985). In evaluating whether defendant was prejudiced by the trial court's erroneous decision to allow the members of the jury to

review items that had been introduced into evidence in the jury room without his consent, we examine whether "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached," N.C.G.S. § 15A-1443(a) (2017), with "[t]he burden of showing such prejudice under this subsection [placed] upon the defendant," *id.*; *see also Huffstetler*, 312 N.C. at 114-15, 322 S.E.2d at 124 (determining that the defendant had not met his burden of showing prejudice pursuant to N.C.G.S. § 15A-1443(a) when "[t]he photographs in question had been previously admitted into evidence and shown to the jury"; the trial court could, in its discretion, have allowed the jury to examine the photographs "closely and at length in the courtroom" pursuant to N.C.G.S. § 15A-1233(a); and "[o]ther evidence . . . linking the murder with the defendant was circumstantial, but compelling"). After carefully reviewing the record, we hold that, while the trial court erred by allowing the jury to examine the photographs that had been admitted into evidence in the jury room without defendant's consent, that error was not prejudicial given the extensive evidence of defendant's guilt and the weakness of defendant's claim of self-defense when considered in conjunction with the other evidence contained in the record.

We begin our analysis by noting that the extent, if any, to which any of the photographs in question were erroneously admitted into evidence in violation of N.C.G.S. § 8C-1, Rule 403 is irrelevant to the proper resolution of the prejudice issue. All but one of the photographs upon which defendant's claim relies were admitted

into evidence and published to the jury without objection. In view of the fact that all of the photographs that the trial court allowed the jury to review in the jury room without defendant's consent were admitted into evidence and the fact that defendant has not challenged the trial court's decision to admit any of these photographs into evidence on appeal, we are necessarily required to assume that these photographs were properly admitted into evidence and to focus our prejudice analysis solely upon whether there is any reasonable possibility that the outcome of defendant's trial would have been different if, rather than erroneously allowing jurors to see these photographs in the jury room, the trial court had either refused to allow the jury to review these photographs at all, forcing the jury to rely upon their review of these photographs earlier in the trial, or allowed the jury to examine the photographs in open court. In other words, the relevant issue for prejudice purposes is not the impact of the photographs themselves upon the jury's deliberations; instead the relevant issue is whether it is reasonably possible that the fact that the jury had an opportunity to review the photographs in the jury room, separate and apart from any inherent impact that those photographs may have had, adversely affected defendant's chances for a more favorable outcome at trial.

As defendant correctly notes, the central issue before the jury at trial was whether defendant did or did not act in self-defense when he killed Ms. Chapman. In arguing that the trial court's erroneous decision to allow the jury to review the photographs that had been admitted into evidence in the jury room without his

consent prejudiced him, defendant argues that the lengthy period of time that the jury was allowed to have photographs of the injuries that were inflicted upon Ms. Chapman's body and photographs of the relatively minor injuries that were inflicted upon him in its possession in the jury room could easily have led the jury to reject his self-defense claim when another jury that did not have access to these photographs in the jury room would have accepted it. We do not find this argument persuasive.

Aside from the fact that the jury had already seen the crime scene and autopsy photographs of Ms. Chapman and the photographs depicting defendant after he had been taken into custody during defendant's trial, the undisputed evidence tends to show that defendant inflicted severe injuries upon Ms. Chapman while sustaining only minor injuries himself. For example, Detective Daniel Iadonisi of the Cherokee Indian Police Department testified that Ms. Chapman had "wounds . . . on her face, her neck area, both sides of her neck . . . on the top of her head and . . . on her back," while Sam Davis, M.D., a pathologist who autopsied Ms. Chapman's body, told the jury that Ms. Chapman "appeared to have sustained fatal sharp instrument wounds of the neck and face," including "two separate . . . lacerations of the skin . . . from the neck across the shoulder blade" that were "likely to have been delivered from the back"; a hematoma on the top of her head caused by "a forceful injury delivered to the body"; "a 3.3 centimeter stab wound to the right lateral neck" and a "stab wound of [the] left anterior neck," either of which would, "if not treated within minutes," have caused her to bleed to death; and a "potentially fatal" "stab injury of the right eye

with perforation of the globe." As a result, the record contained extensive evidence describing the nature and severity of Ms. Chapman's injuries separate and apart from the photographs that the jury was allowed to reexamine in the jury room.

On the other hand, Detective Sean Birchfield of the Cherokee Indian Police Department, who took the photographs of defendant that were admitted into evidence, testified that he saw some scratches on defendant's arms and legs and "a small cut" on the palm of defendant's hand close to his pinky finger on the day after Ms. Chapman was killed. Similarly, Mr. Bradley testified that, when he saw defendant on the morning following the killing, defendant had "a few cuts" and "a couple scratches" on his hands. Finally, defendant answered in the negative when asked on cross-examination, "You didn't need any medical treatment?" and "You didn't need stitches?" Simply put, it is difficult for us to see how any comparison of the photographs depicting the injuries that Ms. Chapman and defendant sustained that the jury made in the jury room would have added much to the impact of the extensive evidence that the jury heard and saw concerning that subject in the courtroom.

In addition to the relative severity of the injuries that Ms. Chapman and defendant sustained, the record contains extensive additional evidence tending to undercut defendant's claim of self-defense. In addition to opining that the wounds to Ms. Chapman's back had been inflicted from the rear, Dr. Davis testified that the injuries to Ms. Chapman's hands were not "consistent with fighting" and were instead

consistent "with being struck." According to Dr. Davis, the wounds to Ms. Chapman's hands were "defensive wounds" that had a "textbook appearance of being struck in a defensive posture," injuries that led Dr. Davis to "conclude that she was not striking, but rather being struck." In addition, Agent Van Williams of the State Bureau of Investigation testified that defendant sent a series of text messages to Mr. Bradley during the final hours before the killing in which defendant stated that "Im goin 2 kil her," that "Im goin 2 I cant take," that "Im over it I cant take no more," that obtaining lime would help him dispose of the body, that he wanted to obtain that substance from Mr. Bradley, and, when Mr. Bradley pleaded with him not to kill Ms. Chapman, defendant responded, "Im sorry I have 2." Finally, defendant testified that, "[f]rom initial contact with the knife," which he claimed to have grabbed to prevent Ms. Chapman from stabbing him in the face, "I never let go of it," and that, despite the fact that Ms. Chapman was still holding the handle of the knife when he grabbed it, "when we fell before we both hit the ground, I had possession of the whole thing." In view of the fact that the only evidence tending to show that defendant acted in self-defense was his own testimony, which the jury had an ample basis for disbelieving, and the "strong evidence against the defendant," we conclude that "letting the jury have [the photographs] in the jury room could not have affected the outcome of the trial." *Cunningham*, 344 N.C. at 364, 474 S.E.2d at 783 (citing *Huffstetler*, 312 N.C. 92, 322 S.E.2d 110).

Admittedly, the jury was allowed to view numerous photographs in the jury room. However, only forty-one of the one hundred and seventy-nine photographs that were admitted into evidence depicted Ms. Chapman's body in any way, and the jury had already had an opportunity to examine these photographs in the courtroom. In addition, while the jury did inform the trial court during its deliberations that it was unable to reach a unanimous verdict, the trial court had already allowed the jury to review the photographs that had been admitted into evidence in the jury room when the jury conveyed this message to the trial court. Moreover, the fact that the record contains evidence tending to show that Ms. Chapman engaged in violent conduct on other occasions provides limited support for defendant's claim of self-defense in light of the extensive evidence, viewed in its entirety, outlined earlier in this opinion. Finally, defendant's contention to the contrary notwithstanding, his reliance upon self-defense in his effort to obtain an acquittal does not change the overall nature of the prejudice-related inquiry that we are required to make with respect to this issue, which, under our decisional law, necessarily focuses upon a determination of the reasonableness of the possibility that the jury would have found that defendant acted in self-defense in light of all of the relevant evidence rather than upon the nature of defendant's defense. As a result, given the strength of the evidence tending to show that defendant did not act in self-defense, the relative complexity of the trial court's instructions to the jury, the jury's decision to convict defendant of a lesser included offense, and the fact that the photographs about which defendant complains had

already been delivered to the jury room when the jury claimed to be unable to reach a unanimous verdict, we hold that it is not reasonably possible that the jury would have returned a verdict more favorable to defendant had the trial court not allowed the jury to review the photographs that had been admitted into evidence and that its members had already seen during the course of defendant's trial in the jury room during the jury's deliberations and affirm the Court of Appeals' determination to the same effect.

### B. "Aggressor" Instruction

Secondly, defendant contends that the Court of Appeals erred by unanimously determining that the trial court did not err "by instructing the jury that self-defense was not available to [defendant] if he was the aggressor." According to defendant, "no evidence was introduced showing that he was the aggressor," with an aggressor for self-defense purposes being one who "aggressively and willingly enter[s] into the fight without legal excuse or provocation," quoting *State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572 (1981). We do not believe that defendant is entitled to relief from the trial court's judgment on the basis of this contention.

At trial, defendant testified that he was sitting on the bed when Ms. Chapman, who outweighed him by thirty to forty pounds, rushed at him with a knife, pulled him back down to the floor after they had fallen, and, as defendant attempted to rise, bit and punched him in an effort to recover the knife that defendant had taken from her. Defendant claimed that he stabbed Ms. Chapman to death because he "had to end

that fight [given that s]he was trying to get the knife back." Based upon this testimony, defendant claims that Ms, Chapman was the aggressor for purposes of the confrontation that led to her death and that the Court of Appeals erred by upholding the trial court's decision to include an "aggressor" instruction in describing the law of self-defense on the grounds that the evidence that defendant took the knife from Ms. Chapman and the text messages that defendant sent to Mr. Bradley "provid[ed] sufficient evidence from which a jury could find that defendant was the aggressor," quoting *Mumma*, ___ N.C. App. at ___, 811 S.E.2d at 220.

In defendant's view, the Court of Appeals "conducted the wrong analysis" in upholding the trial court's decision to give an "aggressor" instruction given that a person who is not the initial aggressor can only attain aggressor status if the initial aggressor has abandoned the fight and communicated that fact to his or her opponent, citing *State v. Wynn*, 278 N.C. 513, 519, 180 S.E.2d 135, 139 (1971), and *Cannon*, 341 N.C. at 82, 459 S.E.2d at 240-41. According to defendant, the Court of Appeals' error rested, at least in part, upon its failure to "interpret [the evidence] in the light most favorable to the defendant" in deciding whether the delivery of an "aggressor" instruction was appropriate, citing *State v. Holloman*, 369 N.C. 615, 625, 799 S.E.2d 824, 831 (2017). As result, defendant urges us to hold that the trial court erred by delivering an "aggressor" instruction and to remand this case to the Court of Appeals to conduct the required prejudice analysis or, in the alternative, to determine that the multiple references to the possibility that defendant was the "aggressor" in the

trial court's self-defense instructions "had a probable impact on the jury's finding that the defendant was guilty," citing *State v. Lawrence*, 365 N.C. 506, 517, 723 S.E.2d 326, 334 (2012).

The State, on the other hand, contends that "[t]he Court of Appeals properly reviewed for plain error the trial court's jury instruction on the aggressor doctrine where defendant did not object to the instruction and the trial evidence more than supported it." In the State's view, "[a]bsent the aggressor instruction, there is not a reasonable probability that the jury would have found that defendant acted in self-defense" given additional factors that had to be considered in determining whether defendant acted in self-defense and the strength of the State's evidence that defendant did not kill Ms. Chapman to protect himself from death or great bodily injury. In light of defendant's testimony that he had control of the knife from virtually the instant that Ms. Chapman initially attempted to stab him, Dr. Davis's testimony that certain of Ms. Chapman's wounds were defensive in nature and that certain other wounds that she had sustained had been inflicted upon her from the rear, the evidence concerning the disparity in the severity of the wounds that Ms. Chapman and defendant sustained, and the text messages that defendant sent to Mr. Bradley, the State contends that "[d]efendant has failed to establish error, much less plain error," in challenging the trial court's decision to deliver an "aggressor" instruction when describing the law applicable to defendant's claim to have acted in self-defense.

A trial court's jury instructions should be "a correct statement of the law and

. . . supported by the evidence." *State v. Conner*, 345 N.C. 319, 328, 480 S.E.2d 626,

629 (citation omitted), *cert. denied*, 522 U.S. 876, 118 S. Ct. 196, 139 L. Ed. 2d 134

(1997).[2] The trial court instructed the jury that:

> The defendant would be excused of first degree
> murder and second degree murder on the ground of self-
> defense if, first, the defendant believed that it was
> necessary to kill the victim in order to save the defendant
> from death or great bodily harm.
>
> And second, the circumstances, as they appeared to
> the defendant at the time, were sufficient to create such a
> belief in the mind of the person of ordinary firmness.
>
> In determining the reasonableness of the
> defendant's belief, you should consider the circumstances
> as you find them to have existed from the evidence,
> including the size, age, and strength of the defendant, as
> compared to the victim, the fierceness of the assault, if any,
> upon the defendant; whether the victim had a weapon in
> the victim's possession, and the reputation, if any, of the
> victim for danger and violence.

---

[2] Although we have not addressed defendant's challenge to the sufficiency of the evidence to support the delivery of an "aggressor" instruction on the merits, we do observe that, while defendant is correct in noting that the trial court should view the evidence in the light most favorable to the defendant in determining whether a defendant is entitled to the delivery of an instruction concerning an affirmative defense, *Holloman*, 369 N.C. at 625, 799 S.E.2d at 831, this principle does not apply to the determination of whether the trial court erred by addressing the "aggressor" doctrine in the course of instructing the jury concerning the law of self-defense. In determining whether a self-defense instruction should discuss the "aggressor" doctrine, the relevant issue is simply whether the record contains evidence from which the jury could infer that the defendant was acting as an "aggressor" at the time that he or she allegedly acted in self-defense. *Cannon*, 341 N.C. at 82-83, 459 S.E.2d at 241 (stating that "the evidence in this case permits the inference that defendant was the aggressor at the time he shot the victim").

The defendant would not be guilty of any murder or manslaughter if the defendant acted in self-defense, and if the defendant was not the aggressor in provoking the fight and did not use excessive force under the circumstances.

One enters a fight voluntarily if one uses toward one's opponent abusive language, which, considering all of the circumstances, is calculated and intended to provoke a fight.

If the defendant voluntarily and without provocation entered the fight, the defendant would be considered the aggressor, unless the defendant thereafter attempted to abandon the fight and gave notice to the deceased that the defendant was doing so. In other words, a person who uses a defensive force is justified if the person withdraws in good faith from physical contact with the person who was provoked and indicates clearly that he desires to withdraw and terminate the use of force, but the person who was provoked continues or resumes the use of force.

A person is also justified in using defensive force when the force used by the person who was provoked is so serious that the person using defensive force reasonably believes that he was in imminent danger of death or serious bodily harm.

The person using defensive force had no reasonable means to retreat, and the use of force likely to cause death or serious bodily harm was the only way to escape the danger.

The defendant is not entitled to the benefit of self-defense if the defendant was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased.

Although defendant has contended on appeal that the record evidence did not support the trial court's decision to instruct the jury concerning the effect of a determination that defendant was the "aggressor" at the time that he killed Ms. Chapman, he did

not object to the delivery of an "aggressor" instruction at trial, thereby waiving his right to challenge the delivery of the "aggressor" instruction on appeal. N.C. R. App. P. 10(a)(2) (providing that "[a] party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection"). On the other hand, Rule of Appellate Procedure 10(a)(4) provides that "[i]n criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule of law . . . may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." *See Lawrence*, 365 N.C. at 512, 723 S.E.2d at 330. As a result of defendant's failure to object to the delivery of an "aggressor" instruction to the jury before the trial court, defendant is only entitled to argue that the delivery of the "aggressor" instruction constituted plain error,[3] under which defendant is not entitled to an award of appellate relief on the basis of the alleged error unless he can "demonstrate that a fundamental error occurred at trial," *id.* at 518, 723 S.E.2d at 334, that "had a

---

[3] Although defendant argued before the Court of Appeals that his challenge to the trial court's decision to deliver an "aggressor" instruction was properly preserved for purposes of appellate review on the basis of the principle enunciated in *State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985) (observing that, "when a trial court acts contrary to a statutory mandate and a defendant is prejudiced thereby, the right to appeal the court's action is preserved, notwithstanding defendant's failure to object at trial"), the Court of Appeals rejected this argument and defendant has not brought it forward for our consideration.

probable impact on the jury's finding that the defendant was guilty," *id*. at 518, 723 S.E.2d at 334 (quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983)).

As this Court recently stated in *State v. Juarez*, 369 N.C. 351, 794 S.E.2d 293 (2016), we need not "decide whether an instruction on the aggressor doctrine was improper" given defendant's failure "to sufficiently demonstrate that, absent instructions on the aggressor doctrine, the jury would not have rejected his claim of self-defense for other reasons."[4]  *Id.* at 358-59, 794 S.E.2d at 300.  Our analysis of the record shows that defendant sent multiple text messages to Mr. Bradley in the hours before Ms. Chapman's death indicating that he wanted to kill her.  In addition, the record contains no physical evidence tending to validate defendant's otherwise unsupported claim to have acted in self-defense and does contain substantial physical evidence tending to undercut his self-defense claim including, but not limited to, the

---

[4] Arguing in reliance upon decisions such as *Virginia Electric & Power Co. v. Tillett*, 316 N.C. 73, 76, 340 S.E.2d 62, 64-65 (1986), defendant contends that, since the Court of Appeals declined to award relief from the trial court's judgment on the grounds that the record supported the delivery of an "aggressor" instruction in this case, we should refrain from deciding whether any error that the trial court might have committed in instructing the jury concerning the "aggressor" doctrine sufficiently prejudiced defendant to constitute plain error and remand this case to the Court of Appeals to enable it to make the necessary prejudice determination in the first instance.  In view of the fact that the ultimate question for our consideration with respect to the trial court's "aggressor" instruction is whether the delivery of that instruction constituted plain error and the fact that plain error analysis requires a reviewing court to determine both whether error occurred, *State v. Torain*, 316 N.C. 111, 116, 340 S.E.2d 465, 468 (stating that "[a] prerequisite to our engaging in a 'plain error' analysis is the determination that the instruction complained of constitutes 'error' at all"), *cert. denied*, 479 U.S. 836, 107 S. Ct. 133, 93 L. Ed. 2d 77 (1986), and, if so, whether any such error was sufficiently prejudicial to merit an award of appellate relief from the underlying trial court judgment, *Lawrence*, 365 N.C. at 516-18, 723 S.E.2d at 333-34, we see no need to remand this case to the Court of Appeals to undertake the necessary prejudice inquiry.

evidence that Ms. Chapman sustained defensive wounds to her hand, that she had sustained stab wounds that had been inflicted from the rear, and that the wounds that defendant sustained were much less severe than the wounds that had been inflicted upon Ms. Chapman. As a result, given that defendant's claim to have acted in self-defense rested upon his otherwise unsupported testimony and that the record contained ample justification for questioning the credibility of defendant's account of the circumstances surrounding Ms. Chapman's death, we cannot conclude that any error that the trial court might have committed in delivering an "aggressor" instruction when discussing the law of self-defense rose to the level of plain error.

### III. Conclusion

Thus, for the reasons stated above, we hold that the trial court's erroneous decision to allow the jury to review the photographs that had already been admitted into evidence in the jury room without defendant's consent did not constitute prejudicial error and that the trial court did not commit plain error by including a discussion of the "aggressor" doctrine in its instructions to the jury concerning defendant's claim to have killed his wife in the exercise of his right of self-defense. As a result, the Court of Appeals' decision finding no prejudicial error in the proceedings leading to the entry of the trial court's judgment is, as modified in this opinion, affirmed.

MODIFIED AND AFFIRMED.

Justice DAVIS did not participate in the consideration or decision of this case.

Justice EARLS concurring in part and dissenting in part.

I agree with the majority that Mr. Mumma cannot meet the high burden of showing that the jury in this case probably would have either remained deadlocked or acquitted him of murder if the aggressor instruction had not been given, a burden he must meet because he did not object to the instruction at trial. *State v. Lawrence*, 365 N.C. 506, 517, 723 S.E.2d 326, 334 (2012). It is particularly noteworthy that the Court's basis for this conclusion is not the theory advanced by the State in this case, namely that defendant became the aggressor when he grabbed the knife from Ms. Chapman, but rather that the evidence of their relative physical injuries, combined with the text messages that Mr. Mumma sent in the hours before the fight demonstrating his state of mind that evening, could have led the jury to disbelieve "defendant's account of the circumstances surrounding Ms. Chapman's death" and reject his claim of self-defense.

Nonetheless, I cannot agree that the trial court's error in sending 179 photographs, including forty-one pictures of Ms. Chapman's dead body, to the jury room over defendant's objection, and therefore in violation of N.C.G.S. § 15A-1233(b), was harmless under the lower standard applicable to this error, namely that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached." N.C.G.S. §15A-1443(a) (2017). Here, when the only question at issue was whether defendant acted in self-defense, it is entirely possible that the jury would have remained deadlocked or reached a different

verdict if jurors had been required to view the photographs in the presence of all the parties in the courtroom, rather than in the privacy of the jury room.

The majority's approach to evaluating the reasonable possibility of a different result is to stand in the shoes of the jury and, "after carefully reviewing the record," come to a conclusion about what verdict the jury hypothetically would have reached if they had not been able to take the 179 photographs into the jury room for the duration of their deliberations. The majority, however, fails to take into account all the evidence in the record, which includes testimony that Ms. Chapman had a history of bipolar disorder and had previously stabbed Mr. Mumma in the arm. On another occasion Ms. Chapman threatened Mr. Mumma with a knife. Chapman was known to be quick to anger for no apparent reason. On the night in question, not only had she consumed a considerable amount of Klonopin and alcohol, but she also was "raising hell" because Mr. Mumma wanted to leave, accused him of pursuing another woman, and pushed and slapped him. Ms. Chapman's son's first thought upon seeing some blood in the bedroom was that his mother had injured Mr. Mumma. Given that the only issue for the jury to decide was whether Mr. Mumma acted in self-defense, it is entirely possible that without prolonged exposure to forty-one pictures of Ms. Chapman's corpse, the jury would have remained deadlocked or reached a different verdict.

Also relevant to this question is the fact that the prosecutor in closing argument specifically directed the jury to take the photographs to the jury room with

them and urged them to study the pictures showing Ms. Chapman's injuries:

> If he stabbed her from the back -- if he stabbed her from the back, what does that say?  Is he really thinking he's going to die?  Is he grabbing for the knife?  He wanted her dead.
>
> Take that photo back.  I hope you do.  Take it with the other photos.  You can request any exhibit you want.  But ask for the photo with the two dots on it.  And I would love to put it up here, but in respect to the family, I don't think they need to see their daughter, and sister, and mother like that.  That's why I've got these boards up here.
>
> Take it back there.  You're the jury.  You get to decide.  Not me, not Mr. Mumma, not Mr. Earwood.  Look at it, and then look at those two wounds from the lacerations.  And if you say yeah, it shouldn't take long.
>
> Grossly excessive force.  Stab wound to the left throat, stab wound to the right neck, stab wound to the right neck, stab wound to the right eye.  Defensive wounds, both right and left hands.  Top of her head had a bruising on her brain.  He had to pull back her scalp and find it.  Up here.  That's what the red dots are on top.

This excerpt strongly suggests the photographs were key to the jury's deliberations and that if the court had followed the law, the jury may have been less influenced by the graphic and disturbing photographs and instead would have, in giving due consideration to all of the evidence in the case, concluded that it had a reasonable doubt as to Mr. Mumma's culpability for murder.

In other cases in which it is uncertain what happened in the jury room or impossible to guess what "might have been," prejudice to the defendant is assumed. Here all we know is that the jury asked to be able to take all the photographs into the

jury room. Whether jurors spent most of the three hours examining the pictures in detail, or looked at one or two and then placed them away on a shelf, is unknown. Perhaps jurors were simply complying with the prosecutor's request, or perhaps they used the pictures of Ms. Chapman's injuries to convince the holdout juror to join the other eleven to convict. If jurors had been required to view the photographs in the courtroom, as defendant had the right to insist, the jury's use of the photographs might have been very different. But the point is, we simply cannot know.

This Court has found per se reversible error in situations in which it is not possible to assess from the record whether the error was prejudicial. *See, e.g.*, *State v. Hucks*, 323 N.C. 574, 580-81, 374 S.E.2d 240, 244-45 (1988) (finding prejudicial error per se when a capital defendant did not have second counsel appointed for him); *State v. Bindyke*, 288 N.C. 608, 627-30, 220 S.E.2d 521, 533-35 (1975) (holding that reversible error per se occurs when an alternate juror is present in the jury room during jury deliberations). It is a curious result that the law says if an alternate juror is in the jury room, there is per se reversible error, but if a defendant objects to the jury taking evidence to the jury room, it remains the defendant's burden to show what cannot be proved with certainty, namely what happened behind the closed doors of the jury room and was in the jurors' minds as they reviewed that evidence in private. The similar problems faced in attempting to analyze prejudice in *Bindyke* and *Hucks* should be instructive in our analysis here. In our "careful review of the record" we should be wary of speculating too much about what is impossible to know.

There is further support for the proposition that it is impossible for a defendant to meet this standard. Even though state law provides that evidence can only go to the jury room if the parties consent, this Court has never found a violation of that statute to constitute prejudicial error. *See State v. Locklear*, 349 N.C. 118, 150-51, 505 S.E.2d 277, 296 (1998) (in which the defendant failed to establish prejudicial error in his conviction for first-degree murder based on the trial court's allowing the jury to take the defendant's statement to police into the jury room without his consent), *cert. denied*, 526 U.S. 1075 (1999); *State v. Cunningham*, 344 N.C. 341, 364, 474 S.E.2d 772, 783 (1996) (The defendant failed to establish prejudicial error in his conviction for first-degree murder based on the trial court's allowing the jury to take evidence into the jury room without his consent, including "an unspent bullet, cartridge casing, and a bullet which had been pulled apart in the police laboratory."); *State v. Cannon*, 341 N.C. 79, 83-86, 459 S.E.2d 238, 241-43 (1995) (concluding that the defendant failed to establish prejudicial error in his conviction for first-degree murder based on the trial court's allowing the jury to take evidence into the jury room over his objection, including "photographs from the scene of the crime and the autopsy, a copy of defendant's confession, [a witness's] first statement to the police, and a diagram of the crime scene"); *State v. Huffstetler*, 312 N.C. 92, 113-15, 322 S.E.2d 110, 123-24 (1984) (determining that the defendant failed to establish prejudicial error in his conviction for first-degree murder based on the trial court's allowing the jury to take evidence into the jury room over his objection, including

photographs that showed "the overall view of the interior of the victim's trailer and the location of the body, a metal fragment found on the floor, and the false teeth found near the body"), *cert. denied*, 471 U.S. 1009 (1985). Under the circumstances of this case, forty-one pictures of the victim's injuries, including autopsy photographs, are likely to have had some effect on the jury. Indeed, the very fact that the prosecutor emphasized the photographs in his closing argument, and the jury asked to see them, demonstrates that they had some significance.

The majority's analysis begins with the assumption that all 179 photographs were properly admitted into evidence, and therefore, the extent to which any of them may have been erroneously admitted in violation of Rule 403 of the North Carolina Rules of Evidence, because they were more prejudicial than probative, is irrelevant to whether defendant was prejudiced by the jury taking them back to the jury room without his consent. This determination misses the point of defendant's argument concerning a Rule 403 analysis. That it may be error under Rule 403 to admit gruesome, distressing, and redundant photographs of a victim demonstrates that the law recognizes the sensational and emotional effect that such photographs can have. *State v. Hennis*, 323 N.C. 279, 283-87, 372 S.E.2d 523, 526-28 (1988), and *State v. Phipps*, 331 N.C. 427, 451-54, 418 S.E.2d 178, 191-92 (1992), are relevant here not because the pictures in this case should not have been admitted at all, but because the logic of those cases should apply to whether defendant was prejudiced when the trial court allowed those pictures to go to the jury room without defendant's consent.

In short, a picture is worth a thousand words, whether under Rule 403 or N.C.G.S. § 15A-1233(b).  And a picture in the jury room throughout jurors' deliberations has a greater impact than a picture viewed in the courtroom during trial.  Hence, it does not resolve the prejudice inquiry to note that the jury had already seen the pictures and heard narrative testimony about the injuries.

If the General Assembly's decision to require the parties' consent before allowing evidence in a trial to go to the jury room, thus abrogating the common law rule that juries hear the evidence in the courtroom, is to have any legal effect, this Court must enforce it.  *See Gooding v. Pope*, 194 N.C. 403, 404-05, 140 S.E. 21, 21 (1927) ("The practice at common law was against allowing the jury to examine the papers introduced in evidence, either during the trial or afterwards in the jury room." (citations omitted)); *Watson v. Davis*, 52 N.C. (7 Jones) 178, 181 (1859) (stating that "[t]he jury ought to make up their verdict upon evidence offered to their senses, *i. e.,* what they see and hear in the presence of the court," and should not be permitted to draw any inference "which their imaginations may suggest, because the opposite party ought to have an opportunity to reply to any suggestion of an inference contrary to what was made in open court").  In this particular case, where the issue is whether defendant acted in self-defense, and where the evidence of Mr. Mumma's slight injuries in comparison to Ms. Chapman's extensive ones is the main evidence supporting the conclusion that Mr. Mumma was the aggressor, I cannot conclude that gruesome pictures of Ms. Chapman's injuries had no effect on the jury's deliberations.

Mr. Mumma was prejudiced by the trial court's error.  I would reverse the ruling of the Court of the Appeals on this issue and remand for a new trial.