An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-707

Filed 17 June 2026

Wake County, No. 23CR348972-910

STATE OF NORTH CAROLINA

v.

WILLIAM JAMESON REECE ATKINS, Defendant.

Appeal by Defendant from judgment entered 31 January 2025 by Judge Vinston M. Rozier in Wake County Superior Court. Heard in the Court of Appeals 11 March 2026.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Stephanie Brennan and Matthew Tulchin, for the State.*
>
> *Janine Fodor for Defendant.*

GRIFFIN, Judge.

Defendant William Jameson Reece Atkins appeals from a judgment entered after a jury found him guilty of second-degree murder. Defendant argues the trial court erred by (1) instructing the jury on the aggressor exception to self-defense, (2) permitting the prosecutor to misstate the law on malice during closing argument, (3) overruling Defendant's objection to the prosecutor's improper argument that

Defendant lied to the 9-1-1 operator, and (4) substituting a juror during deliberations. We hold the trial court erred in instructing the jury on the aggressor exception to self-defense and this error prejudiced Defendant. We grant Defendant a new trial.

## I.     Factual and Procedural Background

This appeal arises from Defendant's conviction of second-degree murder. Defendant's testimony is the basis for many of the factual details to follow.

Defendant and Eric Matthew Laird both served in the United States Army and became friends. After receiving an honorable discharge from service in 2021, Defendant returned to Cary, North Carolina. On or about 1 July 2023, Laird traveled to North Carolina to visit Defendant for the weekend. Defendant picked up Laird from the airport, and they drove to Defendant's apartment. When they arrived at the apartment, the two men began drinking heavily. While drinking and talking, Defendant showed Laird his firearms and ammunition in anticipation for their planned target shooting that weekend.

When Defendant was starting to get ready to go to bed, he and Laird took Defendant's dog outside one more time to use the bathroom. Defendant and Laird took the dog to the wooded area near a creek next to Defendant's apartment complex. Due to his intoxicated state, Laird fell into the creek. Defendant slid down the bank to make sure Laird was okay and helped him get out. They both got wet from this fall. The two men returned to the apartment and changed out of their wet clothes.

Defendant put his phone in a bowl of rice to dry it out. It was around 5:00 a.m. at this point in time.

Defendant went to the bathroom in preparation to go to bed. When he emerged from the bathroom, Defendant saw Laird talking to himself and armed with an AR-15 rifle. Apparently, Laird thought there was a third man outside and seemed paranoid. Defendant tried to deescalate the situation, but Laird was getting more frustrated because Defendant didn't believe there was a man outside. Laird pointed the gun at Defendant multiple times and said he'd shoot Defendant. Defendant tried to grab the gun out of Laird's hands, but they both struggled over it. Defendant pried the gun from Laird's grasp. As Defendant backed away from Laird, Laird threw a candle at Defendant. The candle cut Defendant's arm.

At approximately 6:54 AM on 2 July 2023, Defendant called Cary emergency services using Laird's phone, since his own was still drying out. On this phone call, Laird was recorded saying, "Reece, listen. Atkins, listen." When Defendant was giving the 9-1-1 operator his address, Laird allegedly charged Defendant. In response, while still on the phone with the 9-1-1 operator, Defendant shot at Laird five times. The operator instructed Defendant to put the gun on the kitchen counter. Defendant responded he was "scared to take the gun off the person on the floor." The operator asked Defendant whether Laird had a gun, and Defendant answered he did not. Defendant told the operator he had cleared the rifle and put it on the counter.

Cary Police Department Officer Harper Spell arrived at the scene. She placed Defendant in handcuffs while she secured the area. After securing the area, Officer Spell transported Defendant to the police station.

On 25 July 2023, a grand jury indicted Defendant for first-degree murder. At trial and at the close of the State's evidence, Defendant elected to testify. Defendant admitted to shooting and killing Laird, but claimed the act was committed in self-defense. At the close of all evidence, the trial court stated during the charge conference that it would not instruct the jury of Defendant being an aggressor under North Carolina Criminal Pattern Jury Instruction ("PJI") 206.10. The trial court also stated that it would instruct on Defendant not being an aggressor under PJI 308.10, which concerns self-defense and retreat. Ultimately, the trial court instructed the jury as to first-degree murder, second-degree murder, voluntary manslaughter, and self-defense. The trial court gave an additional instruction that jurors should not contact any courthouse staff.

After the jury recessed for deliberation, two jury conflicts arose. First, Juror Number Six's child was taken to the emergency room and the trial court approved of Juror Number Six joining their child. Second, Juror Number Seven found and returned an identification badge belonging to an employee of the Wake County District Attorney's Office. Juror Number Seven contacted the employee to inform them that the badge was at the security desk and later sent a text message to the employee to confirm receipt of the badge. After learning of this, the trial court

reinstructed the jurors that they should have no contact with any courthouse staff during deliberation. The trial court excused all jurors except Juror Number Seven.

The trial court then conducted an inquiry of Juror Number Seven. During the examination, Juror Number Seven explained he did not believe the employee whose badge he found was associated with the case and thought he could contact the employee despite her status as an employee of the District Attorney's Office. After the trial court's questioning, Defendant's counsel examined Juror Number Seven, which revealed this juror sent a LinkedIn request to the employee. The juror explained he sent the invite as a way to procure the employee's phone number. Juror Number Seven was then excused from the courtroom. A subsequent review of the employee's LinkedIn profile revealed the employee specifically listed their employment with the Wake County District Attorney.

Defendant's counsel informed the trial court that Defendant would be willing to waive his constitutional right to deliberation by a jury of twelve. Accordingly, the trial court began a waiver colloquy. During the colloquy, Defendant confirmed that he had conferred with counsel about the consequences of excusing Juror Number Seven and confirmed his desire to waive his constitutional right to a deliberation by a jury of twelve. Juror Number Seven was then excused from further jury service.

Alternate Juror Number One was brought into the courtroom and examined by the trial court. The trial court concluded that Alternate Juror Number One was fit to serve as a fair and impartial replacement juror for Juror Number Seven. The

trial court reinstructed the jury that it must restart deliberations and disregard anything offered by Juror Number Seven. The jury then recessed to begin deliberating once again.

The jury found Defendant guilty of second-degree murder. The trial court sentenced Defendant to between 216 and 272 months in prison. Defendant orally appealed.

## II.    Analysis

Defendant claims the trial court erred by instructing the jury on the first aggressor exception to self-defense after deciding against the instruction during the charge conference and announcing this decision to both parties.

Normally, to preserve an issue for appeal, a party must have timely requested, objected, or motioned to the issue, stating the specific grounds, unless the grounds were clear from context. N.C. R. App. P. 10(a)(1). Nevertheless, when "a trial court agrees to give a requested pattern instruction, an erroneous deviation from that instruction is preserved for appellate review without further request or objection." *State v. Lee*, 370 N.C. 671, 676, 811 S.E.2d 563, 567 (2018) (explaining that where a trial court agreed to instruct the jury on self-defense, but omitted part of such pattern language in the jury's instruction and failed to give the parties notice of such omission, this substantive deviation preserved this issue for appellate review despite the defendant's lack of objection).

[A] request for an instruction at the charge conference is

sufficient compliance with the rule to warrant our full review on appeal where the requested instruction is subsequently promised but not given, notwithstanding any failure to bring the error to the trial judge's attention at the end of the instructions.

*Id.* (citing *State v. Ross*, 322 N.C. 261, 265, 367 S.E.2d 889, 891 (1988)).

Here, Defendant failed to object to the trial court's instructions on the aggressor theory at trial. However, at the charge conference, the trial court told both parties of its decision to refrain from giving a first aggressor instruction and to leave out such instruction. Neither party objected to the trial court's omission of the aggressor doctrine, so the instructions were agreed upon by both parties. Nevertheless, at trial, the court did not fully excise references to the first aggressor doctrine from its instructions:

> *If [Defendant] was not the aggressor* and [Defendant] was in [Defendant's] own home . . . [Defendant] could stand [Defendant's] ground and repel force with force regardless of the character of the assault being made upon [Defendant].
>
> Therefore, in order for you to find [Defendant] guilty of first-degree murder or second degree murder, the State must prove beyond a reasonable doubt, that [Defendant] did not act in self-defense, *or failing in this, that [Defendant] was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased.*
>
> *If the State fails to prove that [Defendant] . . . was the aggressor with intent to kill or to inflict serious bodily harm*, you may not convict [Defendant] of either first-degree or second-degree murder.

Such language gave the jury the option to find Defendant guilty if it believed Defendant was the initial aggressor. These references to the first aggressor doctrine substantively deviated from the trial court's agreed-upon instructions. Even though Defendant did not object to the instructions in the trial, the issue is preserved because the trial court promised to omit the aggressor doctrine language, but kept part of it in the instructions given to the jury.

"'The jury charge is one of the most critical parts of a criminal trial.'" *Id.* at 674, 811 S.E.2d at 565–66 (citation omitted). When a party presents competent evidence of self-defense at trial, a defendant is entitled to a self-defense instruction, since it is an essential feature of the case. *State v. Morgan*, 315 N.C. 626, 643, 340 S.E.2d 84, 95 (1986) (citations omitted). Additionally, in such circumstances, a trial court must give such instruction, even absent a defendant's specific request for it. *Id.* (citations omitted).

"[A] person is justified in the use of deadly force and does not have a duty to retreat" if he "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself." N.C. Gen. Stat. § 14-51.3(a) (2023). However, this justification is not applicable when the person "[i]nitially provokes the use of force against himself." N.C. Gen. Stat. § 14-51.4(2) (2023). This is known as the aggressor doctrine. *State v. Hicks*, 385 N.C. 52, 60, 891 S.E.2d 235, 241 (2023). In other words, an aggressor may be someone who "'aggressively and willingly enter[s] into a fight without legal excuse or provocation.'" *Id.* (citation omitted).

"When deciding whether to include the aggressor doctrine in jury instructions, 'the relevant issue is simply whether the record contains evidence from which the jury could infer that the defendant was acting as an "aggressor" at the time that he or she allegedly acted in self-defense.'" *Id.* at 60–61, 891 S.E.2d at 241 (quoting *State v. Mumma*, 372 N.C. 226, 239 n.2, 827 S.E.2d 288, 297 n.2 (2019)). Although all evidence must be considered, it must be viewed "'in the light most favorable to the State.'" *Id.* at 61, 891 S.E.2d at 241 (citation omitted). Therefore, the "'State must be given the benefit of every reasonable inference'" and any contradictions in the evidence must be resolved in the State's favor. *Id.* (citation omitted).

In *State v. Tann,* even though the defendant had armed himself in anticipation of a confrontation, the record evidence did not reveal that the defendant started the fight; therefore, the defendant was not the aggressor and was entitled to a self-defense instruction. 57 N.C. App. 527, 531, 291 S.E.2d 824, 827 (1982) (citation omitted). However, that trial court instructed the jury that the defendant "'used excessive force *or was the aggressor*.'" *Id.* (citation omitted). Our Court cannot assume the jury is more discriminating than the judge in that the jury "'ignored the erroneous instruction while applying the correct one.'" *Id.* (citation omitted). Thus, in *Tann*, our Court held the jury instruction error regarding aggression was prejudicial. *Id.* (citation omitted); *accord State v. Ward*, 26 N.C. App. 159, 163, 215 S.E.2d 394, 396–97 (1975).

In *State v. Vaughn*, the decedent assaulted the defendant, and the defendant returned to her car and armed herself with a knife. 227 N.C. App. 198, 199–200, 742 S.E.2d 276, 276–77 (2013). The defendant got out of the car again and the unarmed decedent charged at the defendant; the defendant used the knife to stab and kill the decedent. *Id*. at 200, 742 S.E.2d at 277. Our Supreme Court held it was plain error to instruct the jury on the aggressor doctrine, which effectively deprived the defendant of her self-defense claim. *Id*. at 204, 742 S.E.2d at 280.

"When the trial court delivers an aggressor instruction 'without supporting evidence, a new trial is required.'" *Hicks*, 385 N.C. at 61, 891 S.E.2d at 242 (quoting *Vaughn*, 227 N.C. App. at 202, 742 S.E.2d at 278); *see also State v. Juarez*, 369 N.C. 351, 358, 794 S.E.2d 293, 300 (2016) ("When there is no evidence that a defendant was the initial aggressor, it is reversible error for the trial court to instruct the jury on the aggressor doctrine of self-defense." (citation omitted)). In analyzing whether an erroneous instruction was prejudicial, this Court determines whether there was a reasonable possibility of a different result. *See Lee*, 370 N.C. at 676, 811 S.E.2d at 567 (citing *State v. Ramos*, 363 N.C. 352, 355–56, 678 S.E.2d 224, 227 (2009)); N.C. Gen. Stat. § 15A-1443(a) (2023). The burden of demonstrating such prejudice is on the defendant. N.C. Gen. Stat. § 15A-1443(a).

Here, the record lacks evidence demonstrating Defendant was the initial aggressor, even in the light most favorable to the State. Laird had control of an AR-15 rifle for a period, during which he pointed the weapon at and threatened

Defendant. Defendant was able to wrestle away the gun from Laird's grasp. Defendant then called 9-1-1. While Defendant was on the phone with the 9-1-1 operator, Laird charged at Defendant and Defendant, scared for his life, shot Laird.

Defendant acknowledges one part of the record evidence could have been inconsistent with his testimony. Towards the end of the phone call with the 9-1-1 operator, Defendant stated, "He didn't know I had a firearm around the corner." Defendant testified he made this statement in shock and wasn't thinking clearly; he testified he meant he, *Defendant*, did not know Laird had a firearm when he came out of the bathroom and walked around the corner into the living room. We acknowledge this presents an inconsistency. However, even in the light most favorable to the State, this comment still doesn't indicate Defendant was the initial aggressor. Simple possession of a weapon does not make someone an initial aggressor. Also, in the literal sense of Defendant's alleged unintentional statement, if Laird didn't think Defendant was armed with a weapon, Laird would have felt safer to charge at Defendant. This rationale supports that Defendant was not the initial aggressor.

Here, neither party requested the trial court to include the aggressor language in the jury instructions. Nevertheless, at the charge conference, the trial court told the parties he would use PJI 206.10. PJI 206.10 are the pattern instructions for first-degree murder where a deadly weapon is used, which also covers all lesser included homicide offenses and self-defense. The trial court noted these jury instructions gave

"an opportunity to include language where it concerns someone being the aggressor." Yet, the trial court noted that "[b]ased on what [it] read and the guidance that [it's] given, [it had] not included that," in reference to instructional paragraphs concerning someone being an aggressor. The trial court indicated it would instruct the jury on self-defense without the aggressor doctrine.

In the instructions given to the jury, the trial court excluded one of the optional paragraphs from PJI 206.10 which explained the aggressor doctrine. However, the trial court left three references to the aggressor doctrine in the instructions. The following three paragraphs of the instructions include such references:

> *If [Defendant] was not the aggressor* and [Defendant] was in [Defendant's] own home . . . [Defendant] could stand [Defendant's] ground and repel force with force regardless of the character of the assault being made upon [Defendant]. . . . .
>
> Therefore, in order for you to find [Defendant] guilty of first-degree murder or second degree murder, the State must prove beyond a reasonable doubt, among other things, that [Defendant] did not act in self-defense, *or failing in this, that [Defendant] was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased.*
>
> *If the State fails to prove that [Defendant] . . . was the aggressor with intent to kill or to inflict serious bodily harm*, you may not convict [Defendant] of either first-degree or second-degree murder.

(Emphasis added). PJI 206.10 itself includes the following note:

> Instructions on aggressors and provocation should only be used if there is some evidence presented that defendant

provoked the confrontation. . . If no such evidence is presented, . . . reference to the aggressor throughout this instruction would not be given. In addition, the remainder of the instruction, including the mandate, would need to be edited accordingly to remove references to the aggressor. *It is reversible error to instruct the jury on the aggressor doctrine if the record lacks evidence from which the jury could infer that the defendant was an aggressor at the time the defendant allegedly acted in self-defense.*

(Emphasis added).

Here, the trial court did indeed make references to "aggressor" in the jury instructions. Despite the trial court's intention to remove aggressor language, as it stated, it left in multiple references to the doctrine. The note from PJI 206.10 indicates, in bolded writing, that it is error "to instruct the jury on the aggressor doctrine if the record lacks evidence from which the jury could infer that [Defendant] was an aggressor at the time [Defendant] allegedly acted in self-defense." While the trial court did omit an optional paragraph concerning the aggressor doctrine, it failed to remove all references to the doctrine. This was error.

Defendant argues the lack of a definition for "aggressor" prejudiced him. He claims a broad interpretation of "aggressor," without definitional constraints, could have allowed the jury to conclude Defendant was the aggressor because Defendant was armed with a weapon at the time of the shooting, even though that is not how the aggressor doctrine is applied. *See Vaughn*, 227 N.C. at 199–200, 742 S.E.2d at 276–77. Rather, an aggressor is someone who aggressively and willingly enters into a fight without legal excuse or provocation. *Hicks*, 385 N.C. at 60, 891 S.E.2d at 241.

The record does not demonstrate Defendant was the initial person who aggressively and willingly entered into such fight with Laird. Nevertheless, the jury could have seen Defendant as the aggressor because he was the one holding the weapon when Laird charged. *Id.*; *see Tann*, 57 N.C. App. at 531, 291 S.E.2d at 827. Without such aggressor doctrine language, there is a reasonable possibility the jury could have come to a different verdict.

Defendant also claims the inclusion of such references allowed the jury to reject Defendant's self-defense claim and find Defendant guilty if it determined Defendant was the aggressor. Like in *Tann*, the trial court improperly added phrases contemplating whether Defendant was the aggressor: "If [Defendant] was not the aggressor;" "that [Defendant] did not act in self-defense, or failing in this, that [Defendant] was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased;" and "If the State fails to prove that [Defendant] . . . was the aggressor with intent to kill or to inflict serious bodily harm."

As this Court has previously held, we cannot assume the jury is more discriminating than the judge. The inclusion of the options to find Defendant as the initial aggressor prejudiced his self-defense claim. Since the self-defense instructions were phrased in such a way as to provide an either-or option to the jury, the jury could have otherwise found Defendant not guilty of first-degree or second-degree murder, but selected guilty because it determined Defendant was the aggressor.

If the instructions did not include references to the aggressor doctrine, there is a reasonable possibility the jury would have decided on a different result. We hold the error was prejudicial. Defendant is entitled to a new trial. As we have decided Defendant is entitled to a new trial, we need not address the additional issues on appeal.

## III.    Conclusion

The trial court erred in referencing the aggressor doctrine in the instructions given to the jury and Defendant demonstrated he was prejudiced by this.

NEW TRIAL.

Judges HAMPSON and STADING concur.

Report per Rule 30(e).