IN THE SUPREME COURT OF NORTH CAROLINA

No. 136PA22

Filed 1 September 2023

STATE OF NORTH CAROLINA

v.

WENDY DAWN LAMB HICKS

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision
of the Court of Appeals, 283 N.C. App. 74 (2022), reversing a judgment entered on 12
December 2019 by Judge V. Bradford Long in Superior Court, Randolph County, and
remanding for a new trial. Heard in the Supreme Court on 25 April 2023.

*Joshua H. Stein, Attorney General, by Michael T. Henry, Assistant Attorney
General, for the State-appellant.*

*Marilyn G. Ozer for defendant-appellee.*

EARLS, Justice.

Defendant Wendy Dawn Lamb Hicks was convicted of second-degree murder
after she shot and killed Caleb Adams in her home. Ms. Hicks and Mr. Adams had a
tumultuous relationship, and on the day of the murder, Ms. Hicks had warned Mr.
Adams by text message not to come to her residence. He ignored that warning and
came anyway, precipitating a confrontation between them that left him dead from
two gunshot wounds to his back. At trial, the jury was instructed on self-defense, the
defense of habitation, and the aggressor doctrine. Ms. Hicks contends, and the Court

of Appeals agreed, that the evidence did not support an instruction on the aggressor doctrine.

In this case we are again confronted with the proper application of North Carolina's "castle doctrine" statute, which establishes that a person in their home, motor vehicle, or workplace is presumed to have held "a reasonable fear of imminent death or serious bodily harm" when using deadly force to repel an unlawful intruder. N.C.G.S. § 14-51.2(b) (2021); *see also State v. Benner,* 380 N.C. 621, 632, 2022-NCSC-28, ¶ 26 ("[W]hile the enactment of N.C.G.S. § 14-51.2 was not 'intended to repeal or limit any other defense that may exist under the common law,' we have held that the enactment of N.C.G.S. § 14-51.3 has supplanted the common law right to perfect self-defense to the extent that it addresses a particular issue . . . ." (quoting N.C.G.S. § 14-51.2(g))); *State v. McLymore,* 380 N.C. 185, 195, 2022-NCSC-12 ¶ 23 ("Commonly known as the 'Stand Your Ground' Law, the Act 'restate[d] the law [of self-defense] in some respects and broaden[ed] it in others.'" (alterations in original) (quoting John Rubin, *The New Law of Self Defense?*, North Carolina Criminal Law: A UNC School of Government Blog (Aug. 17, 2011), https://nccriminallaw.sog.unc.edu/the-new-law-of-self-defense)); *State v. Coley,* 375 N.C. 156, 162 (2020) ("Viewing the evidence at trial in the light most favorable to defendant in order to determine whether the evidence was competent and sufficient to support the jury instructions on self-defense and the defense of habitation, we conclude that defendant was entitled to both instructions.").

As a legal matter, the Court of Appeals held that the statutory presumption entitling a person within their own home to use deadly force *regardless of the character of the assault* against them remains subject to the limitation that a defendant is not entitled to use self-defense if they were the aggressor in the situation. *See State v. Hicks*, 283 N.C. App. 74, 81, 2022-NCCOA-263 ¶ 22. Ms. Hicks does not argue that this is incorrect. Instead, Ms. Hicks maintains that there was no evidence in the case from which a jury could find that she was the aggressor in these circumstances.[1] Thus, our only task is to determine whether, in the light most favorable to the State, the evidence was sufficient to support a jury finding that Ms. Hicks was the aggressor when she shot and killed Mr. Adams. The Court of Appeals erroneously considered the evidence in the light most favorable to Ms. Hicks and wrongly concluded that the evidence was insufficient. We hold that the evidence was sufficient to give the aggressor doctrine instruction, find no error in the trial court's decision to give the instruction, and therefore reverse the decision of the Court of Appeals.

## I. Background

**A. Evidence at Trial**

---

[1] At trial, during the charge conference, defense counsel objected to the aggressor instruction on the ground that there was insufficient evidence to demonstrate that Ms. Hicks was the aggressor. In closing argument, defense counsel argued to the jury that if Ms. Hicks was defending her home, believing that Mr. Adams was there to harm her, then "it doesn't matter who the aggressor was."

Wendy Hicks and Caleb Adams first met in September 2015 through their employment at Dart Container. Within a few weeks, they developed an intimate relationship that lasted until Mr. Adams's death on 13 June 2017. Mr. Adams was married to Dana Adams, and he remained so until his death. Ms. Hicks was also married but divorced her husband in April 2016. Both Ms. Hicks and Mr. Adams maintained intimate relationships with other individuals besides each other and their spouses. Ms. Hicks made efforts to keep her other relationships secret from Mr. Adams.

Ms. Hicks and Mr. Adams's relationship was tumultuous; they had several vehement arguments. They frequently referred to each other in a vulgar manner, as demonstrated in their text messages. Mr. Adams was never violent with his wife, though he used coarse language, which his wife attributed to his picking up truck drivers' "lingo."

In early 2017, Mr. Adams introduced Ms. Hicks to methamphetamine. Mrs. Adams testified that using methamphetamine affected Mr. Adams's emotional state. Specifically, she stated that methamphetamine use caused Mr. Adams to become angry. Mr. Adams stored the methamphetamine at Ms. Hicks's house, and she would at times pick up drugs for him.

When Mr. Adams's methamphetamine supplier was arrested, Ms. Hicks introduced Mr. Adams to a new supplier, a man named Doug. Ms. Hicks testified that after a while, she began performing oral sex on Doug at Mr. Adams's instruction to

pay for the methamphetamine. At some point, Ms. Hicks began a separate, intimate relationship with Doug, which she tried to keep secret from Mr. Adams.

The relationship between Ms. Hicks and Mr. Adams became even more strained around 23 May 2017, when Ms. Hicks posted a photo to Facebook of her and Mr. Adams kissing, which was seen by Mr. Adams's wife. Mrs. Adams confronted Mr. Adams who denied that he was the man in the picture. Ms. Hicks then started placing anonymous calls to Mrs. Adams. On 8 June 2017, she called Mrs. Adams around 7:00 a.m., blocking the caller ID, and disclosed that Mr. Adams was having an affair and consuming drugs. Ms. Hicks called again later that day at about 2:00 p.m. and asked Mrs. Adams if she knew that Mr. Adams had been involved in a wreck.

During the week of 12 June 2017, Ms. Hicks and Mr. Adams had several arguments, including one about the photo she had posted to Facebook. Ms. Hicks also testified that Mr. Adams was upset and angry because his supplier had raised the price of methamphetamine and he was concerned about owing people money.

On the morning of 12 June 2017, Mr. Adams went to Ms. Hicks's residence, a trailer where she lived with her seventeen-year-old daughter, April. At trial, April testified that she was awakened that morning by her mother and Mr. Adams arguing. According to April, Mr. Adams slung the door to their residence open, causing the door to hit a dog gate. Mr. Adams proceeded to enter the home and scream profanities and threats at Ms. Hicks. April testified she heard Mr. Adams say, "I've never hit a bitch but you're pushing me to hit a bitch. You're ruining my life. You're ruining my

family." April testified that because she was afraid, she sent messages to her boyfriend describing the events as they occurred. At some point that morning, Mr. Adams left.

That evening, Mr. Adams texted Ms. Hicks multiple times. Ms. Hicks replied that she would leave his drugs on the nightstand in her bedroom, and around 9:15 p.m., Mr. Adams came and picked up his drugs. Around 11:30 p.m., Ms. Hicks texted Mr. Adams, threatening to send sexually explicit photographs to his wife to expose their affair. Approximately half an hour later, around midnight, Ms. Hicks called Mrs. Adams, identified herself, and told her that she and Mr. Adams were having an affair. She also told Mrs. Adams that Mr. Adams was using recreational drugs. During the conversation, Ms. Hicks told Mrs. Adams that she and Mr. Adams had been arguing and asked if he was ever a violent person. Ms. Hicks explained that Mr. Adams had threatened her and that she was concerned for her safety. Mrs. Adams was not aware of Mr. Adams's behavior on the morning of 12 June 2017. Mrs. Adams told Ms. Hicks that Mr. Adams had never been violent with her and stressed that Mr. Adams needed assistance with his substance abuse problem. Ms. Hicks said she had a gun, at which point Mrs. Adams told Ms. Hicks to call the police if she felt threatened by Mr. Adams.

Later that evening, an unknown man arrived at Ms. Hicks's residence. He stood in her yard and yelled, "[W]here's Caleb[?]" Ms. Hicks informed the man that Mr. Adams was not at her residence, and the man instructed Ms. Hicks to tell Mr.

Adams to "call his people." In response, Ms. Hicks began calling Mr. Adams repeatedly. Mr. Adams's reply text stated, "You'll be lucky if you don't end up in a ditch."

At 5:58 a.m. on 13 June 2017, Mr. Adams texted Ms. Hicks and then called her, telling her he was on the way to her house. At 6:13 a.m., Ms. Hicks texted Doug, "He [on the way] here," and then at 6:14 a.m., she texted Mr. Adams, "No, please don't come here. They looking for you." At 6:28 a.m., she texted Doug, "He here."

The next independently verifiable fact is that two minutes later, at 6:30 a.m., Ms. Hicks called 911 and told the operator that she had shot Mr. Adams. Ms. Hicks is the only living eyewitness to what occurred in the bedroom where Mr. Adams was shot. The only other person in the house at the time, April, remained in her room and could only testify regarding what she heard. April testified that she heard Mr. Adams burst into the home and slam the door, as he had done the previous morning. She also heard Mr. Adams tell her mother he was going to kill her, and she could hear that they were engaged in a physical struggle violent enough to move furniture.

Ms. Hicks gave four accounts of what occurred during those two minutes: two different statements to two deputies who had arrived at the scene; a third statement to two detectives at the sheriff's office; and a last version during her testimony at trial. While her first two accounts were virtually identical to one another, they differed slightly from her third statement and even more so from her trial testimony.

All four times, Ms. Hicks asserted that Mr. Adams arrived angry, came into the house, and then came into her bedroom to obtain her phone. When she refused to give him her phone, Mr. Adams grabbed her gun from the nightstand, which was in its holster. From this point on, her accounts differ.

To the two deputies, Ms. Hicks stated that Mr. Adams tried to grab her in an attempt to get her phone, during which he dropped the gun, and she picked it up and shot him. Her account given to the detectives later that day was similar, except that she omitted that Mr. Adams dropped the gun and she picked it up. She stated to the detectives that after she refused to relinquish her phone, a wrestling match ensued, the gun and the phone switched hands, and then she shot him, but she also stated that she could not remember how she got the gun or how it was removed from the holster.

At trial, Ms. Hicks testified that upon picking up the gun, Mr. Adams took it out of the holster and pointed it at her, and she then threw her phone at him. She said Mr. Adams went through her phone and started to leave with the gun. She testified that she told him to leave the gun there, at which point he came back and threw the gun on the nightstand. Next, she stated she picked up the gun and tried to walk past Mr. Adams, who grabbed her arm and started stomping on her feet. She stated she tried to get away, but Mr. Adams pinned her arm. She then pulled the gun

out of the holster and shot him.[2] She stated that upon being shot, Mr. Adams walked past her and dropped face down at the door.

When the police arrived, Mr. Adams was lying on his back on the floor, halfway through the bedroom doorway. A law enforcement officer checked for a pulse and determined that he was dead. By Mr. Adams's leg, the police found a key fitting Ms. Hicks's front door and a "smoke vape" or "vape smoker." Ms. Hicks told an officer at the scene that the key was Mr. Adams's, and that he had used it to enter the trailer.

At trial, a forensic toxicologist testified that the level of methamphetamine in Mr. Adams's blood was 1.5 milligrams per liter and the level of amphetamine was .12 milligrams per liter. The toxicologist further testified to the effects of methamphetamine, including that it can cause heightened alertness, aggression, paranoia, violence, and sometimes psychosis.

The pathologist located two gunshot wounds. One entered the left side of Mr. Adams's back and went through his heart. The second shot entered on the right side of Mr. Adams's back and traveled upward. Either wound could have caused his death.

---

[2] Specifically, Ms. Hicks testified:

> He grabs my left arm and he — he grabs my left arm. He starts to kick and stomp my feet to try to get my feet out from under me. And I'm pulling and — and tried to get away. And he comes around and pins my arm between us. He still has . . . his other elbow, his other arm, and he's elbowing me in the side of the head. And he hits my — in the jaw and the side of the head, and he's still pushing me. He slams my back into the mirror. . . . And . . . as he's hitting me, I'm — everything just starts to — I'd say black out . . . . And at some point, I don't know when, I get the gun out of the holster. And I did — and I shoot.

There was an absence of stippling (when unburnt gunpowder strikes the skin and causes a superficial injury) or damage to Mr. Adams's clothes, which an expert for the State testified indicates that the gun was shot from more than six inches away. Nothing was broken in the house or bedroom.[3] At the scene, Ms. Hicks did not appear to be injured, and she did not complain of any pain. At the beginning of questioning by the detectives, Ms. Hicks had no bruises. However, after about four hours, the detectives noticed what appeared to be bruises starting to develop. After questioning, Ms. Hicks was photographed. These photographs were presented at trial and displayed what may have been bruises, but they were not clear or conclusive.

## B. Procedural History

On 11 July 2017, Ms. Hicks was indicted for the second-degree murder of Mr. Adams. The matter came on for trial by jury in November 2019. At the charge conference, defense counsel objected to an instruction on the aggressor doctrine, arguing that the evidence presented did not allow any inference that Ms. Hicks was the aggressor. In overruling this objection, the trial court explained its reasoning as follows:

> The [c]ourt overrules the Defendant's objection that the aggressor — that Ms. Hicks could not be the aggressor as a matter of law, as I think there's some evidence from which the jury could find that Ms. Hicks obtained the weapon and that Mr. Adams was leaving or that his

---

[3] The front door was broken at one of its hinges. However, Ms. Hicks told the detectives during questioning that this had occurred before Mr. Adams's visits to her house during the week of June 12. Ms. Hicks did not address this in her testimony at trial. April testified that she did not know when it occurred.

conclusions could be drawn by the jury and the [c]ourt, therefore, overrules the Defendant's objection to the jury being allowed to consider the exception to the self-defense as to whether or not she, Ms. Hicks, was the aggressor.

The trial court instructed the jury on the elements of second-degree murder, the elements of voluntary manslaughter, the defense of habitation, self-defense, and no duty to retreat.

Regarding whether Ms. Hicks was the aggressor, the court instructed that she would be considered the aggressor if she "voluntarily and without provocation entered the fight, . . . unless Ms. Hicks, thereafter, attempted to abandon the fight and gave notice to the deceased that Ms. Hicks was doing so" or if Ms. Hicks "reasonably believe[d] that she was in imminent danger of death or serious bodily harm, . . . had no reasonable means to retreat, and the use of force likely to cause death or serious bodily harm was the only way to escape the danger." If the jury found Ms. Hicks was the aggressor, the court instructed that "Ms. Hicks is not entitled to the benefit of self-defense."

The jury found Ms. Hicks guilty of second-degree murder. The trial court sentenced her in the mitigated range for a Class B1 offense, prior record level 1, to a minimum of 180 months and a maximum of 228 months in custody. Ms. Hicks timely gave notice of appeal in open court. On appeal, Ms. Hicks argued the trial court erred in instructing the jury on the aggressor doctrine, and the Court of Appeals agreed, holding that Ms. Hicks is entitled to a new trial. *See Hicks*, 283 N.C. App. at 84. By

order dated 15 June 2022, this Court allowed the State's petition for discretionary review.

## II.     Sufficiency of the Evidence

## A. Self-Defense and the Aggressor Doctrine

Pursuant to N.C.G.S. § 14-51.3, "a person is justified in the use of deadly force and does not have a duty to retreat" if he or she is in a lawful place and "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another" or "[u]nder the circumstances permitted pursuant to [N.C.G.S. §] 14-51.2." N.C.G.S. § 14-51.3(a) (2021). Under section 14-51.2, there is a presumption that a home's "lawful occupant . . . held a reasonable fear of imminent death or serious bodily harm to himself or herself or another" in the use of deadly force if the victim "was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home" which the lawful occupant "knew or had reason to believe . . . was occurring or had occurred." N.C.G.S. § 14-51.2(b) (2021).[4] As well, someone "who unlawfully and by force enters or attempts to enter a person's home . . . is presumed to be doing so with the intent to commit an unlawful act involving force or violence." N.C.G.S. § 14-51.2(d) (2021).

---

[4] Justice Morgan's dissent reads this provision to create a "compulsory" or "mandatory" presumption that "cannot be disregarded by the jury." The text of the statute, however, makes clear that this presumption is "rebuttable" and "does not apply" in specified cases. N.C.G.S. § 14-51.2(c).

However, the defenses pursuant to N.C.G.S. §§ 14-51.2 and 14-51.3 "[are] not available to" someone who "[i]nitially provokes the use of force against himself or herself." N.C.G.S. § 14-51.4 (2021). This is what is commonly known as the "aggressor doctrine." Someone may be considered the aggressor if they "aggressively and willingly enter[ ] into a fight without legal excuse or provocation." *State v. Wynn*, 278 N.C. 513, 519 (1971). Additionally, someone who did not instigate a fight may still be the aggressor if they continue to pursue a fight that the other person is trying to leave. *See State v. Cannon,* 341 N.C. 79, 82 (1995) (stating that evidence that defendant shot the apparently unarmed victim as she was leaving in a car supported a finding that defendant was the aggressor even where the victim initially went to defendant's home and threatened to kill him).

Justifications pursuant to sections 14-51.2 and 14-51.3 may still be available to the initial aggressor if the victim employed force "so serious that the person using defensive force reasonably believes that he or she was in imminent danger of death or serious bodily harm, [they] had no reasonable means to retreat, and the use of force . . . was the only way to escape the danger," N.C.G.S. § 14-51.4(2)(a), or if the initial aggressor "withdraws, in good faith, from physical contact with the person who was provoked, and indicates clearly that he or she desires to withdraw and terminate the use of force, but the person who was provoked continues or resumes the use of force[,]" N.C.G.S. § 14-51.4(2)(b). We have also held that a victim being shot in the back may support an inference that the victim was trying to leave. *See Cannon*, 341 N.C. at 83.

For that reason, a victim being shot in the back is a factor that may be considered in evaluating a defendant's self-defense claim. *See State v. Rush*, 340 N.C. 174, 186 (1995).

"A trial court must give the substance of a requested jury instruction if it is 'correct in itself and supported by the evidence.'" *State v. Mercer*, 373 N.C. 459, 462 (2020) (quoting *State v. Locklear*, 363 N.C. 438, 464 (2009)). When the evidence is conflicting, it is for the jury to determine whether the defendant was the aggressor. *State v. Terry*, 329 N.C. 191, 199 (1991); *State v. Benton*, 299 N.C. 16, 19 (1980).

When deciding whether to include the aggressor doctrine in jury instructions, "the relevant issue is simply whether the record contains evidence from which the jury could infer that the defendant was acting as an 'aggressor' at the time that he or she allegedly acted in self-defense." *State v. Mumma*, 372 N.C. 226, 239 n.2 (2019) (citing *Cannon*, 341 N.C. at 82–83 (stating that "the evidence in this case permits the inference that defendant was the aggressor at the time he shot the victim")). While all evidence is to be considered, "the evidence must be considered in the light most favorable to the State. The State must be given the benefit of every reasonable inference to be drawn from the evidence and any contradictions in the evidence are to be resolved in favor of the State." *State v. Bell*, 338 N.C. 363, 388 (1994) (citing *State v. Sumpter*, 318 N.C. 102, 107–08 (1986)); *cf. Mumma*, 372 N.C. at 239 n.2 (rejecting the defendant's assertion that the evidence is to be viewed in the light most favorable to him). "Contradictions in the evidence are resolved favorably to the

[S]tate." *Sumpter*, 318 N.C. at 107 (1986) (citing *State v. Brown*, 310 N.C. 563 (1984); *State v. Thomas*, 296 N.C. 236 (1978)).

When the trial court delivers an aggressor instruction "without supporting evidence, a new trial is required." *State v. Vaughn*, 227 N.C. App. 198, 202 (2013) (cleaned up); *see also State v. Porter*, 340 N.C. 320, 331 (1995) ("Where jury instructions are given without supporting evidence, a new trial is required.").

## B. Application to this Case

The trial court properly held that the evidence presented at trial supported an aggressor instruction. In reversing that decision, the Court of Appeals made two legal errors. First, the court treated Ms. Hicks's trial testimony as fact without addressing its inconsistencies with her prior accounts. *See Hicks*, 283 N.C. App. at 81–82. Second, the Court of Appeals ignored other evidence contradicting the version of events Ms. Hicks presented at trial. *See id.* On each score, the Court of Appeals mistook how trial courts should examine the record.

When asked to give an aggressor instruction, a trial court must consider whether a jury could reasonably infer from the evidence that the defendant acted as an aggressor. *See Mumma*, 372 N.C. at 239 n.2; *see also Cannon*, 341 N.C. at 82–83. In answering that question, the court must view the record in the light most favorable to the State, drawing all reasonable inferences in its favor. *Bell*, 338 N.C. at 388. Where, as here, there is conflicting evidence on whether the defendant acted as an aggressor and the jury could reasonably draw the inference either way, the State gets

the benefit of the doubt. *See id.*; *see also Sumpter*, 318 N.C. at 107. Properly viewed, the record contained significant evidence from which the jury could reasonably infer that Ms. Hicks acted as the aggressor. For that reason, the trial court correctly instructed the jury,[5] and the Court of Appeals erred by holding that Ms. Hicks is entitled a new trial.

In reaching the conclusion that the aggressor doctrine instruction was not warranted, the Court of Appeals closely tracked Ms. Hicks's testimony at trial, not mentioning her differing previous accounts. *See Hicks*, 283 N.C. App. at 81–82. The opinion recites as facts certain key details that are contradicted by Ms. Hicks's previous statements. *See id.* at 82 (stating that Mr. Adams "threw the Defendant's phone back at her . . . [and] continued to have possession of the firearm" and that he "placed the firearm in his pocket and moved towards the bedroom door" but relinquished it when Ms. Hicks demanded); *id.* at 84 (stating that Mr. Adams "extorted her cell phone from her").

The opinion also rests on factual details that were asserted only in Ms. Hicks's account at trial and were absent from her prior accounts. *See id.* at 82 (stating that Mr. Adams "took [the gun] out of its holster, and pointed it at the Defendant," that "he placed the firearm in his pocket" while he was leaving, and that "[w]hen Defendant attempted to leave the bedroom and flee from the altercation, Caleb

---

[5] The trial court's jury instructions explained the law as set out above; Ms. Hicks does not dispute that the jury instructions were a correct statement of the law.

lunged towards the Defendant and proceeded to kick, push, punch, and shove her"); *id.* at 84 (stating that Mr. Adams "point[ed] a firearm at her[ ] [and] assaulted Defendant without provocation by punching, pushing, kicking, and shoving when she attempted to escape from her bedroom with the firearm").

However, the jury, as instructed, was entitled to disbelieve some or all of Ms. Hicks's testimony at trial. *See, e.g., Ward v. Carmona*, 368 N.C. 35, 37–38 (2015) (explaining that as sole judges of the weight of the evidence and the credibility of witnesses, jurors can believe all, part, or none of the testimony). They could have concluded that her statements made to law enforcement officers immediately after the incident were more likely to be true. They could have given greater weight to the physical evidence. Most importantly, contradictions in the evidence are to be resolved in the State's favor. *See Bell*, 338 N.C. at 388.

Beyond the inconsistencies between Ms. Hicks's trial testimony and her prior accounts, other evidence presented at trial challenges her version of events. By crediting Ms. Hicks's account over substantial physical evidence to the contrary, the Court of Appeals failed to view the record in the light most favorable to the State. That was error. Drawing all inferences in the State's favor, a jury examining the evidence could reasonably infer that Ms. Hicks acted as the aggressor in her confrontation with Mr. Adams. For example, the jury could have noticed that, although Ms. Hicks testified to a violent attack, she did not exhibit obvious injuries. Likewise, though Ms. Hicks recounted a ferocious struggle, nothing in the bedroom

appeared broken, despite the room's small size. And although Ms. Hicks testified that she shot Mr. Adams while trying to escape his blows, the State offered evidence that he was shot in the back from at least six inches away. Each of those contradictions in the evidence could have given a jury pause, prompting them to doubt Ms. Hicks's account and credit the State's. And in deciding to give an aggressor instruction, the trial court properly resolved those contradictions in the State's favor, affording it the benefit of the doubt as our cases prescribe. *See, e.g., Sumpter*, 318 N.C. at 107; *Brown*, 310 N.C. 563; *Thomas*, 296 N.C. 236.

In arguing to the jury, the State emphasized four facts that supported the aggressor instruction: (1) that Mr. Adams was shot in the back; (2) that Mr. Adams had never been physically violent with Ms. Hicks or his wife before this incident, *see* N.C.G.S. § 8C-1, Rule 404(a)(2) (2021); *State v. Bass,* 371 N.C. 535, 544 (2018) (stating that character evidence is admissible to support or rebut an inference that the victim was the aggressor); (3) that the vape found near his body shows Mr. Hicks had likely turned around to leave, getting it out of his pocket because he was going outside; the State argued that "[h]e wanted to start smoking again because he was heading out of the house"; and (4) that he had no intention of harming her because he had "saved her life [just] 48 hours before."

Other evidence in the case further supports the instruction. The jury heard approximately two and a half days of testimony from a witness reading aloud hundreds of pages of text messages between Mr. Adams and Ms. Hicks. This included

messages and photographs exchanged in the weeks leading up to the murder. The jury could draw inferences from this couple's interactions that Ms. Hicks sought to provoke Mr. Adams and that she was angry when he seemed to indicate that he wanted to end their relationship.[6]

Furthermore, the jury could have inferred that Ms. Hicks's fear of Mr. Adams was not genuine from the fact that Ms. Hicks did not call 911 at 5:58 a.m. on the morning of 13 June 2017 when Mr. Adams texted her, and then called her, saying that he was coming to her house. Her subsequent text messages to Mr. Adams telling him not to come to her home that morning, viewed in the light most favorable to the State, arguably were not motivated by her fear of Mr. Adams harming her but rather

---

[6] In the Analysis section of her dissent, Justice Barringer correctly observes that "[t]his Court has long held that speculative evidence is insufficient to sustain a conviction." But there is a difference between "speculative" evidence and circumstantial evidence. We have defined the latter as "proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant." *State v. Adcock*, 310 N.C. 1, 36 (1984). Under our cases, the State may offer circumstantial evidence at trial so long as "a reasonable inference of [the] defendant's guilt may be drawn from" it. *State v. Fritsch*, 351 N.C. 373, 379 (2000). If the State's circumstantial evidence clears that bar, it is "for the jury to decide whether the facts, taken singly or in combination, satisfy it beyond a reasonable doubt that the defendant is actually guilty." *Id.* (quoting *State v. Thomas*, 296 N.C. at 244) (cleaned up); *see also State v. Stone,* 323 N.C. 447, 452 (1988) ("Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence."). Here, the State offered jurors "proof of a chain of facts and circumstances" suggesting that Ms. Hicks was the initial aggressor in her confrontation with Mr. Adams. *See Adcock*, 310 N.C. at 36. Because that circumstantial evidence permits a "reasonable inference" of Ms. Hicks' guilt, it was for the jury to consider and weigh it in deciding whether the State met its burden of proof. *See Fritsch*, 351 N.C. at 379.

demonstrated her concern that other individuals may harm him if he showed up there.[7]

In their two-minute interaction in her bedroom, by Ms. Hicks's own account, she was the only one armed at the time the confrontation escalated to physical force. While according to her account Mr. Adams did pick up the gun, resolving conflicts in the light most favorable to the State, the evidence from her initial statements supports the conclusion that he never pulled the gun out of the holster. The jury could, on this evidence, conclude that she was the first one to employ deadly force, and that when she did, she was the only one in possession of a deadly weapon. Finally, by Ms. Hicks's own account, she stopped Mr. Adams from leaving the bedroom, and the physical evidence discloses that Mr. Adams was shot twice in the back from at least six inches away, if not further. Cumulatively, this evidence was sufficient to support an instruction to the jury that Ms. Hicks could not claim self-defense or defense of habitation if she was the aggressor. *See Terry*, 329 N.C. at 199. As the statutory language and our precedents make clear, defense of habitation is not available to an aggressor. *See* N.C.G.S. § 14-51.4(2).[8]

---

[7] Ms. Hicks's 6:14 a.m. text to Mr. Adams was, "No, please don't come here. They looking for you."

[8] Justice Morgan's dissent contends that Ms. Hicks could invoke "the affirmative defense of defense of another" in addition to her personal self-defense claim. Ms. Hicks did not invoke that defense at trial, and we cannot retroactively raise it for her. At any rate, the text of the statutory "aggressor" doctrine applies wholesale to the "justification described in [N.C.]G.S. § 14-51.2" without distinguishing between personal self-defense or defense of others. N.C.G.S. § 14-51.4.

## III. Conclusion

It was for the jury to decide which version of the facts was proven beyond a reasonable doubt in this case. Where, as here, there was significant evidence from which a jury reasonably could conclude that Ms. Hicks was the aggressor in the two-minute confrontation with Mr. Adams and that she intentionally shot him in the back as he was leaving her bedroom, not because she was in fear of her life or because she reasonably believed he would harm her or her daughter but out of malice, the trial court properly instructed the jury that if it found that she was the aggressor, the presumption in N.C.G.S. § 14-51.2 is no longer available to her. The Court of Appeals failed to consider the facts in the light most favorable to the State in making this assessment. Therefore, we reverse the decision of the Court of Appeals and hold that the trial court properly instructed the jury on the aggressor doctrine.

REVERSED.

Justice DIETZ concurring.

The majority effectively holds that the language in N.C.G.S. § 14-51.4 incorporates the common law aggressor doctrine. That section provides, with limited exceptions, that the castle doctrine and the stand your ground law do not apply to one who "[i]nitially provokes the use of force against himself or herself." N.C.G.S. § 14-51.4 (2021). While the common law aggressor doctrine may be consistent with the statutory "initially provokes" language in some situations, I do not believe the two are coextensive.

For example, in this case the trial court instructed the jury that an "aggressor" includes a person who "uses towards one's opponent abusive language which, considering all of the circumstances, is calculated and intended to provoke a fight." This portion of the instruction, taken from the common law, cannot be squared with the statutory castle doctrine, which creates a presumption that deadly force is reasonable whenever the defendant knows or has reason to know that the victim has unlawfully or forcibly entered the defendant's home. N.C.G.S. § 14-51.2(b) (2021).

When this provision of the castle doctrine applies, the disqualifying language in N.C.G.S. § 14-51.4 does not examine what the defendant did *in response* to that unlawful or forcible entry but instead what the defendant did *to provoke* that unlawful or forcible entry in the first place.

In *State v. McLymore*, 380 N.C. 185 (2022), this Court addressed the question

of "whether the General Assembly intended to add to the common law right to perfect self-defense or abrogate it in its entirety" in enacting N.C.G.S. §§ 14-51.2–.4. *McLymore*, 380 N.C. at 190. In holding that the statutory scheme supplanted the common law, we stated that "when a defendant in a criminal case claims perfect self-defense, the applicable provisions of N.C.G.S. § 14-51.3—and, by extension, the disqualifications provided under N.C.G.S. § 14-51.4—govern." *Id.* at 191. The same reasoning applies equally to the castle doctrine in N.C.G.S. § 14-51.2. In other words, *McLymore* made clear that these statutes entirely supplanted the common law. When addressing self-defense under these statutes, there is no common law, there is only the language of the statute.

Nevertheless, at trial, Hicks did not argue that the common law aggressor instruction was inapplicable to the statutory castle doctrine defense found in N.C.G.S. § 14-51.2. Likewise, she did not request an instruction on the "initially provokes" provision in N.C.G.S. § 14-51.4—the only "aggressor" provision that applies to the statutory castle doctrine under *McLymore*, and one that arguably is narrower than the common law doctrine.

Moreover, on appeal to the Court of Appeals, Hicks argued only that the trial court erred under the common law "by instructing on the aggressor doctrine when all of the evidence showed an enraged Caleb Adams burst into the bedroom of Wendy Hicks and assaulted her." In the Court of Appeals briefing, defendant did not raise the castle doctrine issue, or even cite N.C.G.S. § 14-51.2, much less argue that a

separate, statutory aggressor instruction (one based on the interplay between N.C.G.S. § 14-51.2 and N.C.G.S. § 14-51.4) was the only suitable instruction on provocation with respect to a castle doctrine claim. The decision not to raise these issues is understandable because, as noted above, Hicks never raised these issues at trial, so they are waived on appeal.

As the multiple separate opinions in this case illustrate, even this Court is struggling to understand how the "aggressor" language from our existing case law (and the pattern jury instructions) can be squared with the various statutory self-defense provisions that now govern. These are complicated and thorny legal issues that call out for clarity. But we are constrained to address only those arguments that were adequately raised and preserved in the case. These complicated legal issues were not and therefore must wait for another day. As a result, not only does the law suffer, but so does Hicks.

Justice BERGER joins in this concurring opinion.

Justice MORGAN dissenting.

In respectfully dissenting from the opinion of a majority of my learned colleagues, I join the dissenting opinion of my esteemed colleague Justice Barringer as I write separately to register my own dissenting view, while adopting by reference the "Background" segment of her dissenting opinion.

The series of statutory enactments and appellate case decisions which are invoked here collectively illustrates the fallacy in the majority's reasoning. Firstly, the majority faultily conflates the legal concept of a presumption with the legal concept of an inference in construing N.C.G.S. § 14-51.2 in light of the facts in the present case and erroneously relying on this Court's decisions in *State v. Cannon*, 341 N.C. 79 (1995), and *State v. Rush*, 340 N.C. 174 (1995), as governing authorities here. As noted earlier, pursuant to N.C.G.S. § 14-51.2, defendant was presumed, as the lawful occupant of her home, "to have held a reasonable fear of imminent death or serious bodily harm to . . . herself *or another* when using defensive force that is intended or likely to cause death or serious bodily harm" to Mr. Adams if (1) he was "in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered," defendant's home; and (2) defendant "knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred." N.C.G.S. § 14-51.2(b) (2021) (emphasis added). The majority cites *Cannon* for this Court's recognition that where there was evidence "that the victim was shot

from the side and from behind, [it] further support[ed] the inference that defendant shot at the victim only after the victim had quit the argument and was trying to leave [to go out the driveway]." 341 N.C. at 83. "An inference is nothing more than a permissible deduction from the evidence, while a presumption is compulsory and cannot be disregarded by the jury." *Henderson County v. Osteen*, 297 N.C. 113, 117 (1979) (quoting *Cogdell v. Wilmington & Weldon R.R. Co.*, 132 N.C. 852, 854 (1903)). "It must be borne in mind that presumptions and inferences differ." *State v. Williams*, 288 N.C. 680, 687 (1975). Unfortunately, the majority fails to recognize the distinction between the two related, yet disproportionate, evidentiary components. A presumption *must* be recognized by a jury to establish a component of the case and cannot be disregarded; on the other hand, an inference *may* be recognized by a jury to establish a component of the case but can be disregarded. Here, defendant held the statutory presumption accorded to her by N.C.G.S. § 14-51.2, as the lawful occupant of her home, that she was entitled to employ deadly force against Mr. Adams due to a reasonable fear of imminent death or serious bodily harm to herself or her daughter as a result of the decedent's unlawful and forcible entry into defendant's home, of which defendant was aware, after defendant instructed Mr. Adams to stay away from her residence, after he burst into defendant's home and ultimately her bedroom, after he took defendant's firearm from her bedroom nightstand, after Mr. Adams threatened to kill defendant, and after the two physically tussled with one another. In my view, in the face of a mandatory presumption which operated in favor of

defendant, the State's evidence constituted a mere permissible deduction by the jury which was insufficient to warrant a jury instruction on the aggressor doctrine.

Secondly, the majority conveniently couches the facts and outcomes of *Cannon* and *Rush* in a manner intended to stretch the applicability of these cases to the present case, but it instead merely serves to stretch credulity. In *Cannon*, the defendant unsuccessfully argued to this Court that "the trial court, over objection, erred by instructing the jury that self-defense was unavailable to defendant if defendant was the aggressor" where the evidence showed that the case "permit[ted] the inference that defendant was the aggressor at the time he shot the victim" because "the evidence also show[ed] that immediately before the victim was shot, she had 'straightened her car up to go out the driveway' and she was about to leave," with "[t]he evidence also reflect[ing] that the victim was shot from the side and from behind, further supporting the inference that defendant shot at the victim only after the victim had quit the argument and was trying to leave." 341 N.C. at 82–83. While the majority strives to utilize *Cannon* to narrow the present case's affirmative defense focus to self-defense—just as it seeks to do in its employment of our decision in *Rush*, where the defendant argued that he acted in self-defense and where "the victim had been shot in the back of the head," 340 N.C. at 186—nonetheless defendant in the present case was entitled to invoke not only the affirmative defense of self-defense but also the affirmative defense of defense of another; namely, her daughter and her daughter's friend, who the trial record shows were in an adjoining room to defendant's

bedroom and in whose direction Mr. Adams was moving when defendant shot him in the back. Indeed, in *Cannon* and *Rush*, only two persons were involved in each case—the defendant and the defendant's victim—and in each case only the affirmative defense of self-defense was available to the defendant as juxtaposed to the aggressor doctrine. In the instant case, however, *four* persons were involved—defendant, Mr. Adams, defendant's daughter, and the daughter's friend—and the affirmative defense of self-defense *plus* the affirmative defense of defense of another were available to defendant. Further, while the majority emphasizes the fact that Mr. Adams was shot in the back like the decedent in *Cannon* and the decedent in *Rush*, such that there is an inference that the individual who was shot was trying to leave, nonetheless the victims in *Cannon* and *Rush* had clearly withdrawn from any further interactions with the respective defendants, whereby in the present case, it was not clear that Mr. Adams had withdrawn from any further perpetuation of violence as he headed in the direction of the room which was occupied by defendant's daughter and the daughter's friend.

Based on these observations and for these reasons, I respectfully dissent.

Justice BARRINGER joins in this dissenting opinion.

Justice BARRINGER dissenting.

## I.   Background

Wendy Hicks met Caleb Adams while they were both working at Dart Container in Randleman, North Carolina in September 2015. Mr. Adams maintained relationships with several women, despite being married to his wife, Dana Adams. Ms. Hicks and Mr. Adams began a sexual relationship together shortly after meeting. While in the relationship, Mr. Adams introduced Ms. Hicks to methamphetamine. Mr. Adams and Ms. Hicks had several vehement arguments and referred to each other in vulgar terms. These arguments frequently regarded methamphetamine use or money.

After one such argument, Ms. Hicks called Mr. Adams's wife on 8 June 2017 and exposed her relationship with Mr. Adams. On 12 June 2017 and 13 June 2017, Ms. Hicks told Mr. Adams's wife that Mr. Adams had threatened to hurt Ms. Hicks and her children. At approximately 5:58 a.m. on 13 June 2017, Mr. Adams texted Ms. Hicks saying, "You'll be lucky if you don't end up in a ditch" and that he was coming to her house. Ms. Hicks responded by telling Mr. Adams both on the phone and via text not to come to her house. Despite this explicit instruction, Mr. Adams arrived at Ms. Hicks house at approximately 6:28 a.m. on 13 June 2017. Ms. Hicks, Ms. Hicks's daughter, and her daughter's friend were at the house when Mr. Adams arrived.

Mr. Adams entered the house and went into Ms. Hicks's bedroom. Ms. Hicks

testified that Mr. Adams took her gun from the nightstand and pointed it at her, demanding her phone. After going through her phone, Mr. Adams threw the gun and phone onto the bed. Ms. Hicks took the gun and phone. Ms. Hicks testified that when she tried to leave the bedroom, Mr. Adams blocked her way and physically attacked her.

Ms. Hicks testified that she "black[ed] out" and shot Mr. Adams twice in the back. Shortly after the shooting, Ms. Hicks called 911, and her daughter began performing CPR on Mr. Adams.

## II.    Analysis

At issue in this case is the interplay between N.C.G.S. § 14-51.2, commonly known as the castle doctrine, and N.C.G.S. § 14-51.4, commonly known as the aggressor doctrine.[1] Section 14-51.2(b) states that:

> (b) The lawful occupant of a home, motor vehicle, or workplace is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if both of the following apply:
>
> > (1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home, motor vehicle, or workplace, or if that person

---

[1] In his concurrence, Justice Dietz argues that the statutory aggressor doctrine found in N.C.G.S. § 14-51.4 is not before the Court. I disagree. The issue for which this Court allowed review is "whether the Court of Appeals erred by awarding a new trial based on the aggressor instruction." Further, the statutory scheme was argued to this Court without objection from either party.

> had removed or was attempting to remove another against that person's will from the home, motor vehicle, or workplace.
>
> (2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

N.C.G.S. § 14-51.2(b) (2021).

In the present case, Ms. Hicks was in her own home. After being admonished twice not to enter her home, Mr. Adams did so and attacked Ms. Hicks in her bedroom. The evidence indicates that Mr. Adams had unlawfully and forcibly entered Ms. Hicks's home. Accordingly, Ms. Hicks "is presumed to have held a reasonable fear of imminent death or serious bodily harm to . . . herself or another," N.C.G.S. § 14-51.2(b), and therefore, was "justified in [her] use of deadly force," N.C.G.S. § 14-51.3(a) (2021), unless an exception applies.

The General Statutes of North Carolina provide several exceptions to when this presumption applies. Section 14-51.2 further states that:

> (c) The presumption set forth in subsection (b) of this section shall be rebuttable and does not apply in any of the following circumstances:
>
> . . . .
>
> (5) The person against whom the defensive force is used (i) has discontinued all efforts to unlawfully and forcefully enter the home, motor vehicle, or workplace and (ii) has exited the home, motor vehicle, or workplace.

N.C.G.S. § 14-51.2(c) (2021).

This Court has long held that speculative evidence is insufficient to sustain a criminal conviction. *E.g.*, *State v. Harrelson*, 245 N.C. 604, 607 (1957); *State v. White*, 271 N.C. 391, 395 (1967); *see State v. Taylor*, 362 N.C. 514, 526 (2008); *State ex rel. Utils. Comm'n v. Cooper*, 368 N.C. 216, 222–23 (2015). The evidence is merely speculative that Mr. Adams "discontinued all efforts to unlawfully and forcefully enter the home." *See* N.C.G.S. § 14-51.2(c)(5). Admittedly, he was shot in the back, implying that he was facing the door to the bedroom. However, Mr. Adams was facing the door to an interior room of her home, a home where Ms. Hicks's daughter and her daughter's friend were down the hall. Ms. Hicks retained the right to protect herself and the other people in her home, even when Mr. Adams turned to face away from her.[2] The evidence is insufficient to support the exception found in N.C.G.S. § 14-51.2(c)(5).

The aggressor doctrine is codified in N.C.G.S. § 14-51.4 which provides that:

> The justification described in G.S. 14-51.2 and G.S. 14-51.3 is not available to a person who used defensive force and who:
>
> . . . .
>
> (2) *Initially provokes the use of force against himself or herself.* However, the person who initially provokes the use of force against himself or herself

---

[2] In footnote 6, the majority correctly defines circumstantial evidence as the "proof of a chain of facts and circumstances indicating the guilt or innocence of a defendant. Under our cases, the State may offer circumstantial evidence at trial so long as 'a reasonable inference of the defendant's guilt may be drawn from' it." In the present case, Ms. Hicks shot Mr. Adams in the back; however, this does not "suggest[ ] that Ms. Hicks was the initial aggressor in her confrontation with Mr. Adams." *Supra* at 19 n.6.

will be justified in using defensive force if either of the following occur:

> a. The force used by the person who was provoked is so serious that the person using defensive force reasonably believes that he or she was in imminent danger of death or serious bodily harm, the person using defensive force had no reasonable means to retreat, and the use of force which is likely to cause death or serious bodily harm to the person who was provoked was the only way to escape the danger.

> b. The person who used defensive force withdraws, in good faith, from physical contact with the person who was provoked, and indicates clearly that he or she desires to withdraw and terminate the use of force, but the person who was provoked continues or resumes the use of force.

N.C.G.S. § 14-51.4 (2021) (emphasis added). To justify the trial court providing this instruction to the jury, there must be evidence that Ms. Hicks was the initial aggressor; yet there is no such evidence. When the record "discloses no evidence tending to show that the defendant brought on the difficulty or was the aggressor," giving an instruction on the defendant as an aggressor is reversible error because such instruction would be "partially inapplicable, incomplete and misleading." *State v. Washington*, 234 N.C. 531, 535 (1951). "When there is no evidence that a defendant was the initial aggressor, it is reversible error for the trial court to instruct the jury on the aggressor doctrine of self-defense." *State v. Juarez*, 369 N.C. 351, 358 (2016).

Accordingly, the trial court erred.

### III.    Conclusion

"[A] person is justified in the use of deadly force and does not have a duty to retreat in any place he or she has the lawful right to be" if he or she uses deadly force "[u]nder the circumstances permitted pursuant to [N.C.]G.S. § 14-51.2." N.C.G.S. § 14-51.3(a). Ms. Hicks used deadly force under the circumstances described in section 14-51.2 to defend herself, her daughter, and her daughter's friend. Therefore, her conviction should be overturned. Under the castle doctrine, Ms. Hicks "is presumed to have held a reasonable fear of imminent death or serious bodily harm to . . . herself or another." N.C.G.S. § 14-51.2(b). There was insufficient evidence to support that Ms. Hicks was the initial aggressor, and therefore, the trial court should not have given the aggressor doctrine instruction. Moreover, there was merely speculative evidence introduced to rebut the presumption found in N.C.G.S. § 14-51.2. Thus, I would reverse Ms. Hicks's conviction. Accordingly, I respectfully dissent.

Justice MORGAN joins in this dissenting opinion.