An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-86

Filed 5 November 2025

Bladen County, No. 20CR050565-080

STATE OF NORTH CAROLINA

v.

MARCUS CYRIL MCKOY, Defendant.

Appeal by defendant from judgment entered 9 November 2023 by Judge Richard Kent Harrell in Bladen County Superior Court. Heard in the Court of Appeals 9 September 2025.

> *Kaelyn N. Sweet, for defendant-appellant.*

> *Attorney General Jeff N. Jackson, by Special Deputy Attorney General Thomas H. Moore, for the State.*

FLOOD, Judge.

Defendant Marcus Cyril McKoy appeals from the trial court's judgment finding him guilty of second degree murder. On appeal, Defendant argues the trial court plainly erred by failing to remove three references to the aggressor doctrine in Pattern Jury Instruction 206.10. Upon review, we conclude the trial court did not plainly err by failing to remove all references to the aggressor doctrine in its

instructions.

## I.   Factual and Procedural Background

The Record tends to show that the following incident occurred on 24 May 2020. According to Oneasha McKoy, who has a "family member that is married to [Defendant's] sister[,]" Defendant told Oneasha that he was driving to his grandmother's home in Elizabethtown, North Carolina, when he passed two men standing on the side of the road and recognized one of the men to be David Swindell, Jr. As Defendant was driving past Swindell, Swindell threw up his hands "as if [he] wanted to fight." Defendant stopped his vehicle, exited, and started walking towards Swindell and the other unknown man, but then "returned to his vehicle." As "[Defendant] was on his way back [to his car]. . . [Swindell and the unknown man] started shooting at him[,]" so Defendant shot back. Defendant then drove away and went to the house of Faith Smith, who is a cousin of both Defendant and Swindell.

Meanwhile, an unidentified person called 911 and reported the gunshots. Police Officer Darrell Spaulding was the first to arrive at the scene, where he encountered two individuals. Officer Spaulding stopped and "asked them where the shots were coming from, who was shooting." During their conversation, the individuals directed Officer Spaulding to a body. Officer Spaulding went in the direction he was directed and found an unresponsive man, later identified as Swindell, lying on the ground. Upon approaching Swindell, Officer Spaulding checked for a pulse and observed "blood and a gunshot wound that appeared to be on the side

of his head[,]" and a firearm that "was in the close proximity of the deceased." Investigators later identified the firearm as "[a] Glock 10, 10-round capacity magazine." North Carolina State Bureau of Investigation ("SBI") Crime Scene Agent LaGarren Bullard also recovered a 26-round magazine from "Swindell's back pocket[,]" and six shell casings from the scene.

According to Smith, Defendant came "running in [her] house" and was still at her house when she received a phone call that confirmed Swindell was "gone." Once Smith relayed this information to Defendant, "he bust out screaming and crying[,]" claiming, "he didn't mean to, he was just trying to defend himself."

Oneasha testified that she was helping Defendant's girlfriend, Ieshia Curtis, clean up Curtis's new home in Bladenboro, North Carolina, when Defendant called Curtis and stated, "he needed some help because somebody was dead." Curtis and Oneasha then drove to Smith's house to pick up Defendant. Upon arriving at Smith's house, Oneasha "went to look" at the car Defendant was borrowing and saw "a bullet hole in the driver door" of the car. At Defendant's request, Oneasha drove Curtis and Defendant to his sister's house in Bladen County and later to another house in Fayetteville, North Carolina. While at the house in Fayetteville, Defendant explained the series of events to Curtis, Oneasha, and Defendant's sister, Lisa McKoy, and stated, "he had shot back in self-defense." After describing what happened, Defendant left but was not arrested until seventeen days after the alleged murder.

On 1 June 2020, Elizabethtown police charged Defendant with one count of

first degree murder; on 6 July 2020, a grand jury returned a true bill of indictment against Defendant.

This matter came on for trial on 30 October 2023. At trial, Oneasha testified that on the morning of 24 May 2020, Defendant showed up at Curtis's house around 9:00 a.m. and started arguing with Curtis. Oneasha called 911 after Defendant threatened "to shoot" Curtis and Oneasha. Smith also testified that after Defendant left Curtis's new home, Defendant drove to Smith's house to drop off Defendant's daughter. While at the house, Smith observed Defendant arguing outside on the phone on two separate occasions; after the second phone call, Defendant came into the house, grabbed a black rifle, and left. Oneasha testified that Defendant returned to Curtis's home, argued with Curtis, and threatened "to hit" Curtis and Oneasha. Defendant left before Oneasha called 911 to report these threats.

At the close of all evidence, the trial court conducted an official charge conference and provided a list of proposed jury instructions, including N.C.P.I. Crim. 206.10—the pattern jury instruction for first degree murder and self-defense—to counsel. During the charge conference, the trial court reviewed the list of proposed jury instructions and informed counsel that it had "removed references to the aggressor doctrine" "in the self-defense instructions[.]" The written draft of proposed jury instruction on first degree murder and self-defense included the following language, in pertinent part:

> The defendant would not be guilty of any murder or

manslaughter if the defendant acted in self-defense, and if the defendant was not the aggressor in provoking the fight; and did not use excessive force under the circumstances.

. . . .

Therefore, in order for you to find the defendant guilty of first-degree murder or second-degree murder the State must prove beyond a reasonable doubt, among other things, that the defendant did not act in self-defense. If the State fails to prove that the defendant did not act in self-defense or was the aggressor with intent to kill or to inflict serious bodily harm you may not convict the defendant of either first or second-degree murder. However, you may convict the defendant of voluntary manslaughter if the State proves the defendant used excessive force.

. . . .

For you to find the defendant guilty of first-degree murder the State must prove six things beyond a reasonable doubt:

. . . .

And, sixth, that the defendant did not act in self-defense or that the defendant was the aggressor in provoking the fight with the intent to kill or inflict serious bodily harm upon the deceased.

Second-degree murder differs from first-degree murder in that the State does not have to prove specific intent to kill, premeditation or deliberation. For you to find the defendant guilty of second-degree murder, the State must prove beyond a reasonable doubt that the defendant unlawfully, intentionally, and with malice wounded the victim with a deadly weapon, proximately causing the victim's death. The State [must] also prove that the defendant did not act in self-defense.

The trial court then left to allow counsel to review the proposed instructions "in detail," for approximately twenty-five minutes, before resuming the charge

conference. The State asked the trial court to clarify the use of the aggressor doctrine, to which the trial judge replied he was "cautious" about the "notion that if the Trial Court delivers an aggressor [instruction] without supporting evidence[,] a new trial is required." The following relevant discussion transpired:

> [The State]: I don't know if you necessarily out of abundance of caution would put it in the instruction. I did want to get clarification before closing arguments as to whether primary aggressor analysis arguments are still going to be within the purview of jury argument.
>
> Court: I think it would certainly play into the chain of events in terms of what happened based upon the evidence as presented, with the two arguing and then gunshots ring out. I just -- my evaluation of the evidence was there was enough uncertainty that I felt like it may confuse the issues to give the jury an aggressor instruction where there's just not a lot of evidence to say who exchanged words first, who came into the argument first, and that sort of thing.
>
> [The State]: Yes, sir. I just wanted to clarify as you mentioned it before the break, those are still permissible arguments a[s] to the analysis.
>
> Court: Yeah, I think it still plays into the self-defense of there being an argument, what happened, when he went back to his car, that sort of thing.

Defense counsel did not object to, nor request an amendment to, the proposed Jury Instruction 206.10 with the three references to the aggressor doctrine. Defense counsel did request for the court to add the "stand your ground doctrine" and remove references to the aggressor language in a separate jury instruction, which the trial court ultimately agreed to do.

During closing arguments, the State contended, "[Defendant's] benefit of self-defense is not allowed if he's the aggressor[,]" "[Swindell] is the one who is not the primary aggressor because he's walking down the road where somebody confronts him[,]" and "all of [the] evidence helps you determine who is the primary aggressor." After closing arguments, the trial court read the agreed upon instructions to the jury—which included three references to the aggressor doctrine in Jury Instruction 206.10. Defense counsel did not object to the trial court's instructions as read, and told the trial court she had no "additions, corrections, [or] modifications to the instructions[.]"

On 9 November 2023, the jury returned a verdict finding Defendant guilty of the lesser-included offense of second degree murder. Defendant timely appealed.

## II.    **Jurisdiction**

This Court has jurisdiction to hear an appeal from the final judgment of a superior court pursuant to N.C.G.S. §§ 7A-27(b) and 15A-1444(a) (2023).

## III.    **Standard of Review**

As an initial matter, we must address which standard of review is appropriate for this matter. On appeal, Defendant concedes that he failed to object to the instructions as read but nevertheless contends that full appellate review is warranted because the "agreed-upon instruction [was] promised but not given[.]" The State, on the other hand, argues Defendant did not properly preserve this issue for appeal

because Defendant's counsel did not "request" the trial court remove the aggressor doctrine from the jury instruction on first degree murder and self-defense.

North Carolina Appellate Rule 10(a)(2) provides "[a] party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict[.]" N.C.R. App. P. 10(a)(2) (2023). "The purpose of Rule [10(a)(2)] is to encourage the parties to inform the trial court of errors in its instructions so that it can correct the instructions and cure any potential errors before the jury deliberates on the case and thereby eliminate the need for a new trial." *State v. Oliphant*, 228 N.C. App. 692, 696 (2013) (alteration in the original) (citation omitted). "Where a defendant has properly preserved [his] challenge to jury instructions," this Court reviews decisions regarding the trial court's jury instructions de novo. *State v. Richardson*, 270 N.C. App. 149, 152 (2020).

To support his proposition, Defendant relies on *State v. Ross*, 322 N.C. 261 (1988). In *Ross*, the defendant specifically requested the jury instruction regarding the refusal of a defendant to testify. *Id.* at 264. While the trial court initially agreed to include the defendant's requested instruction, it ultimately failed to include it in the jury charge. *Id.* The defendant, however, failed to object to the jury instructions prior to jury deliberations. *Id.* Nonetheless, our Supreme Court determined a full appellate review was warranted because "a request for an instruction at the charge conference is sufficient compliance with [Appellate Rule 10(a)(2)] to warrant our full

review on appeal where the requested instruction is subsequently promised but not given, notwithstanding any failure to bring the error to the trial judge's attention at the end of the instructions." *Id.* at 265; *see also State v. Pakulski,* 319 N.C. 562, 575 (1987) (holding a full appellate review was warranted where the record showed that "defense counsel complied with the spirit of Appellate Rule [10(a)(2)]" by requesting an instruction that was subsequently promised but not given).

*Ross* and *Pakulski* are inapplicable, however, where a defendant fails to object to a proposed instruction, object to the instruction as given, or request an additional instruction at the jury charge conference. *See State v. Hayes*, 183 N.C. App. 602, 608 (2007) (holding *Ross* and *Pakulski* were distinguishable because "there was no objection to the proposed instruction, no objection to the instruction as given, no request for an additional instruction at the jury instruction conference, and no objection following the judge's charge to the jury").

In the instant case, the trial court informed both parties during the charge conference that it planned to give Pattern Jury Instruction 206.10 and remove references to the aggressor doctrine. Both parties were given draft copies of the proposed jury instructions, time to review them, and an opportunity to request any additions, corrections, or modifications. While Defendant requested a substantive change to another proposed jury instruction, he failed to request that the trial court remove the aggressor language from proposed Pattern Jury Instruction 206.10. Where Defendant failed to request or object to the trial court's proposed jury

instruction, he failed to call any errors to the trial court's attention so "that it [could] correct the instructions and cure any potential errors before" jury deliberations commenced. *See Oliphant*, 228 N.C. App. at 696. Accordingly, this issue was not properly preserved for appeal.

In an alternative argument, Defendant specifically and distinctly requests this Court to review for plain error. This Court reviews for plain error where counsel fails to preserve an issue for appeal, but specifically and distinctly contends the issue is plain error. *State v. Gregory*, 342 N.C. 580, 584 (1996). The plain error standard requires a defendant to establish a three-part test:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a "probable impact" on the outcome, meaning that "absent the error, the jury probably would have returned a different verdict." Finally, the defendant must show that the error is an "exceptional case" that warrants plain error review, typically by showing that the error seriously affects "the fairness, integrity or public reputation of judicial proceedings."

*State v. Reber*, 386 N.C. 153, 158 (2024) (internal quotation marks and citations omitted). For the second prong of the plain error test, the defendant must show "that it is 'probable, not just possible,' that the outcome would have been different absent the error." *Id.* at 160 (quoting *State v. Juarez*, 369 N.C. 351, 358 (2016)). Before applying plain error analysis to jury instructions, however, we must first determine "whether the instruction complained of constitutes error." *State v. Cummings,* 361 N.C. 438, 470 (2007).

## IV.    <u>Analysis</u>

On appeal, Defendant argues the trial court "erred or plainly erred including 'aggressor' language within the essential elements and final mandate of N.C.P.I. 206.10 because this deviated substantially from the agreed upon pattern jury instruction[.]" Furthermore, Defendant contends that the three references to the aggressor doctrine could have led the jury members to incorrectly understand that they could convict Defendant of murder if they found he either "did not act in self-defense *or* [] that he was the aggressor with the intent to kill [] Swindell."

The effect of the aggressor doctrine is significant because, if applicable, the aggressor doctrine "denies a defendant 'the benefit of self-defense if he was the aggressor in the situation.'" *State v. Corbett*, 269 N.C. App. 509, 566 (2020) (quoting *Juarez*, 369 N.C. at 358). "Broadly speaking, the defendant can be considered the aggressor when she 'aggressively and willingly enters into a fight without legal excuse or provocation.'" *State v. Vaughn*, 227 N.C. App. 198, 202 (2013) (quoting *State v. Wynn*, 278 N.C. 513, 519 (1971)). In a case where "there is no evidence that a defendant was the initial aggressor, it is reversible error for the trial court to instruct the jury on the aggressor doctrine of self-defense." *Juarez*, 369 N.C. at 358.

In *State v. Hicks*, our Supreme Court clarified that when the trial court is deciding whether to include "the aggressor doctrine in jury instructions, 'the relevant issue is simply whether the record contains evidence from which the jury could infer that the defendant was acting as an "aggressor" at the time that he or she allegedly

acted in self-defense.'" 385 N.C. 52, 60–61 (2023) (quoting *State v. Mumma*, 372 N.C. 226, 239 n.2 (2019)). But "[w]hen the trial court delivers an aggressor instruction without supporting evidence, a new trial is required." *Id.* at 61 (citation omitted). In *Hicks*, our Supreme Court held the trial court did not err in including the aggressor doctrine where the jury could have inferred the defendant was the aggressor because her self-defense testimony contained inconsistencies, she did not exhibit obvious injuries, nothing in her small bedroom showed signs of a struggle, and the victim was shot in the back—indicating that he was leaving. *Id.*

Here, the State and the trial court discussed whether the evidence supported including the aggressor doctrine in the jury instructions. Noting how cautious it was of our Supreme Court's decision in *Hicks*, the trial court ultimately decided it would not include the aggressor doctrine because there was "not a lot of evidence to say who exchanged words first, who came into the argument first[.]" Rather than object to the trial court's decision, the State merely, and "out of abundance of caution[,]" agreed that the trial court need not include the aggressor doctrine in the jury instruction. While the trial court successfully removed most of the references to the aggressor doctrine, the trial court erred by failing to remove three references to the aggressor doctrine where the evidence did not support delivery of an aggressor instruction. *See Hicks,* 385 N.C. at 61.

The State argues, however, that the trial court did not err in including language pertaining to the aggressor doctrine because the evidence suggested

Defendant was the primary aggressor. Even if an instruction on the aggressor doctrine was permissible, it is nonetheless error for the court to fail to "fully, correctly, and explicitly instruct" the jury "on a substantial feature of the case arising on the evidence." *State v. Graves*, 18 N.C. App. 177, 181 (1973) (internal quotation marks and citations omitted). Accordingly, the failure to remove all references to the aggressor instruction from Pattern Jury Instruction 206.10 constituted error.

Determining this was error, we next consider whether the error constituted plain error; that is, we assess whether absent this error, a different verdict was "probable, not just possible[.]" *See Reber*, 386 N.C. at 160. Prior to the adoption of the plain error rule, the rule was that "where the court charges correctly at one point and incorrectly at another, a new trial is necessary because the jury may have acted upon the incorrect part." *State v. Harris*, 289 N.C. 275, 280 (1976). Since adopting the plain error rule, however, our Supreme Court has held that even if a trial court improperly gives an instruction on the aggressor doctrine, the defendant must still "show that, absent the erroneous instruction, it is probable that the jury would have found that he acted in perfect self-defense." *Juarez*, 369 N.C. at 358–59.

Defendant relies on *State v. Hunt*, 192 N.C. App. 268 (2008), to argue he was prejudiced by the trial court's erroneous instruction. Specifically, Defendant argues the trial court's error entitles him to a new trial because the trial court did not correct its erroneous instruction.

In *Hunt*, the trial court properly instructed the jury on first degree murder,

second degree murder, and involuntary manslaughter. *Id.* at 270. When instructing on voluntary manslaughter, however, the trial court misstated the law as to the burden of proof. *Id.* After jury deliberations commenced, the jury asked for written instructions for second degree murder and both manslaughters. *Id.* at 271. The trial court provided the jury with written instructions, but the jury instructions that were provided contained the same misstatement as to the burden of proof. *Id.* The jury subsequently convicted the defendant of second degree murder. *Id.* On appeal, the State argued "that the error should be non-prejudicial because the trial court merely mis-spoke[.]" *Id.* at 271. In rejecting the State's argument, however, this Court determined the trial court's misstatement was more than a misstatement because "the trial court further compounded the problem by providing the jury with a written document that contained the same misstatement as to the burden of proof." *Id.* Ultimately, this Court was "unable to conclude that the instructional error did not have a probable impact on the jury's finding of guilt" where the trial court made a misstatement as to the burden of proof during its jury charge and provided the same misstatement to the jury in writing, and thus, this Court granted the defendant a new trial. *Id.* at 271–72.

We agree with Defendant's contention that the erroneous instruction in *Hunt* is similar to the erroneous instruction in this case. While the trial court's instruction in the instant case was not a "misstatement of law," the trial court's erroneous instruction is nonetheless similar to the one in *Hunt* because it included three

erroneous references to the aggressor doctrine after the trial court indicated it would not do so. Likewise, as Defendant asserts and is apparent from the transcript, the trial court further "compounded the potential for juror confusion[,]" by giving the jurors a copy of the written instructions as agreed upon by the parties—which also included the three erroneous references to the aggressor doctrine.[1] Lastly, the correct instructions the trial court subsequently provided did not "cure the earlier error." *See State v. Castaneda*, 196 N.C. App. 109, 117 (2009) (granting the defendant a new trial because the trial court erred in charging the jury and the later correct instruction "did not cure the earlier [error;]" thus, there was a reasonable possibility a different result would have occurred, had the erroneous instruction not been given).

Nevertheless, *Hunt* is distinguishable from the case at hand in at least one crucial aspect. As noted, this Court in *Hunt* was "unable to conclude" whether the trial court's error had a probable impact on the jury's finding of guilt. After *Hunt* was decided, however, our Supreme Court provided guidance for this Court in determining whether the trial court's erroneous instructions had a probable impact on the outcome. Specifically, and as noted above, for the second prong of the plain error test, Defendant must show that the error had a "probable impact" on the

---

[1] We note that the Record does not contain a copy of the jury instructions provided to the jurors. "The printed record in criminal actions shall contain . . . copies of all other documents filed and statements of all other proceedings had in the trial courts which are necessary for an understanding of all issues presented on appeal unless they appear in another component of the record on appeal[.]" N.C.R. App. P. 9(a)(3)(i).

outcome, meaning that "absent the error, the jury *probably* would have returned a different verdict." *See Reber*, 386 N.C. at 158 (emphasis added). In other words, Defendant must show a different result was "almost certain[ ]" without the error. *See id.* at 159 (citing *Probably*, New Oxford American Dictionary (3d ed. 2010) and *Probably,* Merriam-Webster's Collegiate Dictionary (11th ed. 2007)).

In analyzing whether the error before us rises to the level of plain error, we find *Jaurez* to be instructive. In *Juarez*, this Court held that the trial court erred in including an instruction on the aggressor doctrine because there was no evidence indicating the defendant was the initial aggressor, but did not determine whether the trial court's error rose to the level of plain error. 369 N.C. at 358. Upon review, our Supreme Court determined—without deciding whether the trial court erred by including an aggressor instruction—that even if the trial court erred, any error was not plain error because the State offered more than one theory to "contradict [the] defendant's evidence as to each of the other elements of self-defense[,]" and the jury could have rejected the defendant's claim of self-defense for another reason. *Id.* at 359. Ultimately, our Supreme Court held that the defendant failed to meet his burden of plain error because he "failed to sufficiently demonstrate that, absent instructions on the aggressor doctrine, the jury would not have rejected his claim of self-defense for other reasons." *Id.*

In the instant case, Defendant successfully demonstrates how the trial court's failure to remove the three references to the aggressor doctrine may be prejudicial,

but Defendant nonetheless fails to show why it is *probable* "that, absent instructions on the aggressor doctrine, the jury would not have rejected his claim of self-defense for other reasons." *See id.* Similar to *Juarez*, here, the State offered evidence to contradict Defendant's claim of self-defense by pointing out inconsistencies in Defendant's story and how "his actions afterwards tell [the jury] something different" from self-defense. Indeed, it is possible that the jury may have rejected Defendant's claim of self-defense because it found that he was the primary aggressor—especially when considering the State's repeated references to the aggressor doctrine during closing arguments and the court's failure to instruct the jury correctly. "But a close case is not enough to prevail on the prejudice prong of plain error." *Reber*, 386 N.C. at 162.

Based on the evidence, we cannot say with "almost certainty" that the jury rejected Defendant's claim of self-defense because of the trial court's references to the aggressor doctrine, and not for other reasons. *See id.* at 159. Accordingly, the trial court did not plainly err by failing to remove all references to the aggressor doctrine in Pattern Jury Instruction 206.10. *See Juarez*, 369 N.C. at 359.

## V.    Conclusion

After careful review, we conclude the trial court did not plainly err by failing to remove all references to the aggressor doctrine.


NO PLAIN ERROR.

Judges COLLINS and CARPENTER concur.

Report per Rule 30(e).